497 F.Supp. 141 (1980)
Gary E. SIMON, Plaintiff,
v.
ST. LOUIS COUNTY, MISSOURI, et al., Defendants.
No. 77-1140-C(3).
United States District Court, E. D. Missouri, E. D.
June 27, 1980.
*142 Francis L. Ruppert, Clayton, Mo., Kent Hull, South Bend, Ind., for plaintiff.
Thomas Wehrle, County Counselor, Andrew J. Minardi, Asst. County Counselor, Clayton, Mo., Glen R. Murphy, Gaithersburg, Md., for defendants.

MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court on the merits of plaintiff's complaint following a trial to the Court sitting without a jury. Plaintiff brought this action pursuant to 29 U.S.C. §§ 793 and 794, and 42 U.S.C. §§ 1983 and 1985. Plaintiff, who was left paraplegic after a gunshot wound in a shooting that occurred while he was a St. Louis County Police Officer, alleges that his discharge in 1972, after his injury, was effected without due process and that the failure of the St. Louis County Police Department to rehire him violates his rights under the Rehabilitation Act of 1973.
After very careful consideration of the pleadings, the testimony of the witnesses, the documents in evidence, the extensive stipulations of the parties, and otherwise being fully advised in the premises, the Court hereby makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52. Additionally, any finding of fact equally applicable as a conclusion of law is hereby adopted as such, and conversely, any conclusion of law applicable as a finding of fact is adopted as such.

FINDINGS OF FACT
1. Plaintiff Gary Simon is a citizen of the United States residing in the Eastern District of Missouri.
2. Defendant St. Louis County is a political subdivision of the State of Missouri. The St. Louis County Police Department *143 (the Department) is an agency of defendant St. Louis County. Colonel Gilbert Kleinknecht is the Superintendent of Police in St. Louis County (the Superintendent) and has supervisory and managerial control of the Department and all its personnel, both civilian and commissioned, pursuant to Article IV, § 4.275 of the St. Louis County Charter (1968). The St. Louis County Board of Police Commissioners (the Board) is in charge of the Department pursuant to §§ 4.270.1-7 of the St. Louis County Charter. Pursuant to § 4.270.7 of the County Charter, the Board is authorized to, inter alia: formulate policies governing the operation of the Department; to appoint a superintendent of the Department a person qualified and experienced in police administration and law enforcement; and to promulgate, upon the recommendation of the Superintendent, a manual of rules and regulations for the qualifications, conduct and discipline of personnel of the Department, and its operation.
3. From January, 1973 through the time of the trial defendant St. Louis County has received Federal Financial assistance. Much of this money has been in the form of Law Enforcement Assistance Administration and revenue sharing funds which were used to benefit the Police Department which has as a primary function the hiring of commissioned police officers. Approximately 90% of its budget goes to salaries.
4. Plaintiff, who was born on January 20, 1947, was appointed effective January 28, 1969, to the rank of Probationary Patrolman with the St. Louis County Police Department. Effective on his appointment, plaintiff was assigned to the Division of Field Operations and detached to the Division of Training and Personnel for the purpose of attending the St. Louis County Police Academy. As part of his routine training he was transferred to different areas of the Department. Effective May 12, 1969, he was reattached to the Division of Field Operations assigned to the Second District. Effective September 1, 1969 he was transferred to the Division of Services, Communications Bureau. He remained there until he was transferred to the Division of Field Operations, effective July 1, 1970. From that date until the time of his injury, plaintiff was assigned as a police officer to the Division of Field Operations.
5. In his capacity as a police officer assigned to the Division of Field Operations plaintiff's duties included, inter alia, the following: the patrol of various areas of St. Louis County in a patrol car; the prevention and discovery of the commission of crimes; the apprehension of criminal offenders; the enforcement of vehicle and traffic laws; and the making known the police presence in the community in such a manner that its presence contributed to the deterrence of law violations. His duties also included answering calls and radio complaints involving: fires; automobile accidents; misdemeanors and felonies; and a wide variety of domestic disturbances, including but not limited to assistance with mentally or physically ill persons, neglected, abused or delinquent children, and marital disturbances. Plaintiff, as well as other commissioned officers, was also responsible for conducting accident investigations and for conducting preliminary investigations at the scenes of crimes; for administering first aid to persons; for gathering evidence, locating and questioning witnesses, and making arrests as necessitated by circumstances; and testifying as a witness in court. In addition, he had responsibilities for establishing traffic control and police protection at fires, accidents, and other incidents which may attract crowds; and for performing various other police duties such as checking and reporting deficient street lights, signs and road surfaces used by the public.
6. Although there are certain bureaus or divisions of the Department which substantially involved more sedentary activity in the performance of their duties than described in the Division of Field Operations (See Findings of Fact Nos. 18 and 19), the majority of activities of that Division require an officer to be able to run, jump, hop, stoop, turn, pivot or perform similar movements quickly and without the aid of another person or supporting device.
*144 7. On November 24, 1971 plaintiff was shot in the abdomen and suffered a severe wound to his spine which resulted in the loss of the use of his legs. He was hospitalized for extensive treatment, including operations, although none of the treatment was successful in restoring motor function to his legs. He was diagnosed as having a condition of paraplegia. After further treatment, including several surgeries and rehabilitative treatment at the Craig Hospital in Englewood, Colorado, plaintiff continued to be diagnosed as a paraplegic up until the date of trial. His condition of paraplegia is a permanent condition that will not deteriorate, although it may improve.
8. As a result of his paraplegic condition, plaintiff requires the use of leg braces and crutches to walk. He is unable to stand or support the weight of his body on either of his legs without the use of his crutches. He cannot run, jump, hop, stoop, turn, pivot or perform similar movements without the aid of a supporting device or the aid of another person. Plaintiff requires the use of braces and crutches to gain ingress and egress from an automobile or other motor vehicle. He cannot drive an automobile without the aid of specially fitted hand controls and automatic transmission.
9. At the time of his injury plaintiff had satisfactorily completed his training and was a fully commissioned police officer with the Department. From November 24, 1971 until July 5, 1972, plaintiff continued to receive his salary as a commissioned officer with the Department.
10. By a letter from Robert diGrazia, then Superintendent of Police for the County, dated July 10, 1972, plaintiff was terminated from the Department. In that letter, Superintendent diGrazia said in pertinent part "... in view of your inability to fulfill the duties of a St. Louis County police officer, I must regretfully advise you that I have no alternative but to terminate your employment effective July 5, 1972." Defendants' Exhibit B.
In addition, the letter indicated that another reason for plaintiff's termination was that the Department, based on an opinion from the St. Louis County Counselor, had determined that his injury was not in the line of duty. Specifically Superintendent diGrazia said:
This department has been advised that while your injury did occur during the period of employment, there was no causal connection between your injury and your employment, nor were you performing duties incidental thereto at the time of the injury. Defendants' Exhibit B.
Later, however, plaintiff successfully appealed his denial of disability retirement benefits, thus obtaining a reversal of the Department's position that his injury was not suffered in the line of duty. He was then awarded full disability. See § 204.220 St. Louis County Revised Ordinance (1964). Despite the fact that both parties presented much evidence by way of exhibits, documents and stipulations regarding the "line of duty" aspect of plaintiff's injuries and subsequent determinations by defendants, the Court does not attach much relevance to the issue. For purposes of the instant lawsuit the relevant facts involve the date of plaintiff's complained of termination and the nature and extent of his injuries and resulting condition of paraplegia as it relates to his subsequent application for employment with the Department as a fully commissioned police officer.
11. Plaintiff was not given a pre-termination hearing prior to his July 5, 1972 discharge as a commissioned officer with the Department.
12. Plaintiff filed the instant lawsuit in which he asserts, inter alia, that the July 5, 1972 termination was carried out in violation of 42 U.S.C. § 1983 and his rights not to be deprived of property without due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution, on October 26, 1977.
13. In March of 1976 plaintiff met informally with Superintendent Kleinknecht, who had since replaced Superintendent diGrazia, and requested that he be reinstated as a commissioned police officer with the Department. Col. Kleinknecht refused to *145 consider plaintiff for reinstatement because he considered plaintiff physically unable to assume the job as a commissioned officer.
14. Plaintiff made a formal application for the position of police officer which was recorded on August 16, 1976. Defendants' Exhibit P.
15. On April 20, 1978, by consent of the parties to this lawsuit, plaintiff was medically examined by Samuel W. Hardy, M. D., a physician employed by defendant St. Louis County. Dr. Hardy's practice is limited to internal medicine and hematology. Dr. Hardy recorded his detailed examination results on May 12, 1978, in which he summarized and concluded as follows:
Gary Simon is a 31 year old, white male, former St. Louis County Police Officer, who is examined for reinstatement as an officer, with the St. Louis County Police Department. Mr. Simon was injured as the result of a gunshot wound, in November of 1971 and has a resultant paraplegia from that incident. The gentleman is obviously highly motivated and has made a better recovery from this than I would have thought possible, at the time of his discharge from the hospital. His demeanor throughout the examination is one of cheerfulness. He has tremendous dedication to his pursuit which is unabashedly to regain appointment as a police officer, with the St. Louis County Police Department. But by his own admission he does not meet the standards as set forth by the Department, nor does he meet the most minimal standard that a reasonable individual would set for general police duty. He is unable to drive an ordinary automobile and unable to walk without mechanical assistance encumbering both hands and both legs. For example: on rising from a seated to a standing position it is necessary for Mr. Simon to pull himself up with his hands, latch his braces, then pick up his two canes, before he is able to take a step.
* * * * * *
I can see no leeway open to me either by the stated physical requirements of this department nor by the dictates of common sense to judge Mr. Simon capable of doing police work and it is with regret and sadness that I am forced to find him not an acceptable applicant. Defendants' Exhibit SS.
Plaintiff has not been reinstated as a commissioned police officer with the Department.
16. The Department has promulgated in its Department Regulations a very extensive set of medical criteria labeled "Section II. Medical Standards." Defendants' Exhibit V. Among the many conditions for which an applicant must be rated non-acceptable are the presence of "[r]esiduals of trauma" (Section 51.1(e), p. 34), or "[d]eformities due to fracture or other injury which seriously interfere with function and weight-bearing power" (Section 25.1(o), p. 16). The Court finds that the defendants properly followed their own criteria in rejecting plaintiff's application for reinstatement as a commissioned police officer. The Court notes here that there are other standards that require a finding of "non-acceptable" which may appear to apply to our circumstances, however, their wording is so conclusory as to be of little assistance. For example, Section 25.1(g) p. 15 of the standards provides for non-acceptance of an applicant affected by "[m]uscle paralysis or contraction which disturbs function to the degree of interference with police service.")
17. While not contending that he is able to perform most of the physical functions of a commissioned police officer, plaintiff asserts that there are some functions within some bureaus that he could perform adequately by virtue of the fact that he has already completed his training in a satisfactory manner. The Court notes here that the record shows that plaintiff has never performed in a less than admirable manner either during his training or during his time as a commissioned officer. Plaintiff contends further that, despite his handicap, he could perform the functions required of a commissioned officer at no appreciable risk to the Department or to the public it serves.
18. The Department is run on a daily basis by the Superintendent, who serves *146 under the Board of Police Commissioners. In addition to several smaller offices which are of no consequence to the instant case (e. g. the Office of Chaplains), the Department is made up of five divisions, each of which is managed by a major who serves under the Superintendent. Also, each division is made up of several bureaus which are staffed by commissioned officers and clerical personnel.
The Division of Field Operations is made up of the Bureaus of: Uniform Patrol; Tactical Operations; Flight Operations; School Safety Patrol; and Reserve Police. The Division of Inspectional Services is made up of the Bureaus of: Staff Inspections, Internal Affairs; and Criminal Intelligence. The Division of Criminal Investigations includes the Bureaus of: Crimes Against Property; Crimes Against Persons; Drug Abuse; Juvenile Affairs; Special Investigations; and Fugitive Affairs. The Division of Auxiliary Services is comprised of the Bureaus of: Criminal Identification; Communications; and Central Police Records. The Division of Administration includes the Bureaus of: Financial Management; Training and Personnel; Planning and Research; Data Systems; and Police-Community Relations. An outline description of those Bureaus has been admitted and considered by the Court. Plaintiff's Exhibit 2.
19. Plaintiff has conceded that he is unable to function as a commissioned officer in most of the Division of Field Operations (the Bureau of School Safety Patrol excepted) or other areas of the Department which require physical agility. He argues, however, that there are certain bureaus or offices in which he could work satisfactorily and without risk to the public or to his own well being, despite the fact that the vast majority of jobs as a commissioned officer require physical agility. Specifically, plaintiff avers that he is presently qualified to work in such areas as the Bureau of Internal Affairs, the Bureau of School Safety Patrol, the Bureau of Communications, or as a desk officer at any precinct.
The Bureau of Internal Affairs is responsible for carrying out fair, impartial and thorough investigations of alleged or suspected acts of misconduct by any member of the Department. Plaintiff's Exhibit 2. The Bureau of School Safety Patrol is responsible for the coordination and inspection of all school safety patrol functions in the area served by the Department. Id. The Bureau of Communications is responsible for the operations and maintenance of the radio and telephone communications systems of the Department and those St. Louis County municipalities contracting for dispatching services. Id. And as a precinct desk officer, who at least occasionally works alone, plaintiff's primary duty would involve handling the paper and communications work of that precinct, including the booking of arrestees and the checking in of patrol cars when they are left at the precinct lot. He would also be responsible for the answering of alarms in the Colonel's office, evidence locker and arsenal.
The Court finds, as plaintiff argues, that his handicap would not prevent him from adequately performing the great majority of tasks noted above. But the Court also finds that the descriptions noted herein are descriptions of some but not all of the tasks of any commissioned officer. Specifically, and as defendants have pointed out, it also comes within the responsibility of a commissioned officer to effect a forcible arrest and aid in disaster emergency relief if necessary and under any circumstances at any time. Secondly, the Court finds that it is within a person's role as a commissioned officer to be transferred through a number of bureaus to become competent at a variety of functions. There is no strict departmentalization in that sense. Plaintiff's own employment record as a commissioned officer, as well as the records in evidence of other officers, bears this out.
Also, the credible testimony of Col. Kleinknecht adduced at trial shows that many of the clerical functions performed by commissioned officers are being turned over to non-commissioned personnel.
*147 20. The Court is not persuaded by plaintiff's arguments that a desk officer, for example, is very rarely or in fact never called upon to subdue a prisoner or perform physical tasks in the event of a national disaster or similar emergency. The Court finds that the role of the commissioned officer, if stripped of the responsibility to give such aid, as well as the ability to transfer from bureau to bureau within the Department, would be largely that of performing the clerical tasks of a supportive nature to the Department. To be sure, these basically sedentary tasks comprise much of the work for some of the smaller bureaus and offices. The Court finds, however, that plaintiff is not able to function as a commissioned officer because he is capable of performing only the clerical and sedentary component of some of the areas of the Department.
21. The Court finds that defendants are ready and willing to consider plaintiff as a non-commissioned employee with the Department.

CONCLUSIONS OF LAW
The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1343, 29 U.S.C. § 794, 42 U.S.C. §§ 1983 and 1985, and the Fourteenth Amendment to the United States Constitution.
Plaintiff has alleged violations of his civil rights, as well as those provided under the Rehabilitation Act of 1973, specifically 29 U.S.C. §§ 793 and 794, by virtue of defendants' dismissal of him as a commissioned police officer without a pre-termination hearing in 1972, and by their current refusal to rehire him as a commissioned officer of the St. Louis County Police Department.
As noted above in Finding of Fact 10, plaintiff was terminated in July of 1972, many months after his paralyzing injury, without a pre-termination hearing. Defendants supplied plaintiff only with a statement of reasons for his termination in the letter from Superintendent diGrazia dated July 10, 1972. The letter referred to plaintiff's physical condition, as well as the then existing determination that his injury was not received in the line of duty (the "line of duty" question was, however, subsequently resolved in plaintiff's favor). At that time, both the plaintiff and the defendants were aware of the extent of plaintiff's injuries and of his dismal prognosis. Also, both sides were aware that much rehabilitative treatment had been tried, all to little or no avail. Consequently, this Court is at a loss to determine what benefit plaintiff would have obtained by a hearing on the matter. In view of the entire circumstances of plaintiff's 1972 termination, therefore, the Court is of the opinion that a hearing would have been futile, particularly in light of the fact that his termination was not for disciplinary reasons but rather was because of his known physical condition.
It is clear that plaintiff had a property interest in his job as a commissioned police officer with the Department within the meaning of the Fourteenth Amendment. As such, he had a right not to be deprived of that job without due process of law. See generally, Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Kennedy v. Robb, 547 F.2d 408 (8th Cir. 1976). The question for our determination then becomes an analysis of what process is due. Mackey v. Montrym, 443 U.S. 1, 10, 99 S.Ct. 2612, 2617, 61 L.Ed.2d 321 (1979). The factors of our consideration include:
the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Id., quoting Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).
Additionally, it is well settled that "[m]inimum due process requirements are neither `an inflexible structure' [Morrissey v. Brewer, 408 U.S. 471, at 490, 92 S.Ct. 2593, at 2604, 33 L.Ed.2d 484 (Brennan, J., concurring)] nor `graven in stone' (Wolff v. *148 McDonnell, 418 U.S. 539, at 572, 94 S.Ct. 2963, at 2982, 41 L.Ed.2d 935)" United States ex rel. Richerson v. Wolff, 525 F.2d 797, 805 (7th Cir. 1975).
In view of the foregoing, the Court concludes that any risk to plaintiff of an erroneous deprivation of his interest in being a commissioned officer was sufficiently minimized by the written statement of reasons for his July, 1972 termination. The Court emphasizes, however, that this conclusion is based on the fact that the nature and extent of plaintiff's injuries and resulting incapacity were well known to both sides and, as such, we limit this holding to the particular facts set forth in the record of this case. We note, too, that ours was not the kind of contested disciplinary matter that arose in the context of a tenured state employee in Kennedy v. Robb, 547 F.2d 408 (8th 1976). In that case the Court found that a pre-termination hearing was necessary in the situation before it which involved plaintiff's "formidable assertion, namely that he has a right to have his say before he is fired, particularly since in this situation the `issues of credibility and veracity * * * play a significant role' in the decision reached" (emphasis supplied) (footnote omitted). Kennedy v. Robb, supra, 547 F.2d at 414-415, quoting Mathews v. Eldridge, supra, 424 U.S. at 325, 96 S.Ct. at 898.
Plaintiff has also pleaded violations of Section 503 of the Rehabilitation Act of 1973, 29 U.S.C. § 793. That section provides in pertinent part:
(a) Any contract in excess of $2,500 entered into by any Federal department or agency for the procurement of personal property and nonpersonal services (including construction) for the United States shall contain a provision requiring that, in employing persons to carry out such contract the party contracting with the United States shall take affirmative action to employ and advance in employment qualified handicapped individuals as defined in section 706(7) of this title
. . . . .
(b) If any handicapped individual believes any contractor has failed or refuses to comply with the provisions of his contract with the United States, relating to the employment of handicapped individuals, such individual may file a complaint with the Department of Labor. The Department shall promptly investigate such complaint and take such action thereon as the facts and circumstances warrant, consistent with the terms of such contract and the laws and regulations applicable thereto.
Before a consideration of the merits of plaintiff's complaint may be undertaken, the Court must face the serious problem of whether a private right of action in district court is available to the plaintiff under § 793. A conclusion that the right does not exist of course bars any further consideration of claims alleged under that section.
The statute section by its terms does not expressly provide for a private right of action in district court. This silence alone, however, is not determinative. Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). But the statute does set forth a specific means of redress in § 793(b) by providing that a complaint may be brought with the Department of Labor and, further, that the Department of Labor have investigatory and enforcement powers regarding such complaint.
As such, we are faced with the question of whether Congress, despite its silence on the matter, intended a private right of action to exist under § 793. In the only appellate decision on the issue to date, the United States Court of Appeals for the Fifth Circuit undertook a very illustrative and thorough analysis of the problem using the standards for determination of legislative intent set forth by the Supreme Court in Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) and Cort v. Ash, supra. In Rogers v. Frito-Lay, Inc., 611 F.2d 1074 (5th Cir. 1980) the Court analyzed § 793 in light of the following factors:
1. Was the plaintiff one of the class for whose especial benefit the statute was enacted?

*149 2. Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? [and]
3. Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? Id. at 1079-1085.
The Court then concluded that no private right of action could be allowed under § 793. The Court reasoned, in regard to point 1, that, inter alia, the statute was "structured as a directive to federal agencies," Id. at 1080, and did not find in that context that strong evidence existed to show that Congress intended to confer a particular right on a class which included the plaintiffs. As to the second point, the Court found no particular indication in the implicit terms of § 793 or in the pronouncement subsequent to its passage to give a private right of action. Id. at 1080-1084. The Court also pointed out the clear distinction in focus between § 793 and 29 U.S.C. § 794, the latter having been found by many courts (see below) to create a private right. The Court noted that § 793 had its own enforcement mechanism in subsection (b) and said that "section 503 (§ 793) does not outlaw discrimination; it requires affirmative action covenants to be inserted in government contracts." Id. at 1083. And in regard to the third point set out above, the Court noted the existence of the remedial administrative scheme and reasoned that "`where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.'" Id. at 1085, quoting from Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979).
This Court is in agreement with both the reasoning and holding of the Fifth Circuit in Rogers v. Frito-Lay, Inc. and accordingly will find for the defendants on plaintiff's § 793 claim. See also, Anderson v. Erie Lackawanna Railway Co., 468 F.Supp. 934 (E.D.Ohio 1979); Wood v. Diamond State Telephone Co., 440 F.Supp. 1003 (D.Del. 1977); contra: Hart v. County of Alameda, 485 F.Supp. 66 (N.D.Cal.1979); Duran v. City of Tampa, 430 F.Supp. 75 (M.D.Fla. 1977); Drennon v. Philadelphia General Hospital, 428 F.Supp. 809 (E.D.Pa.1977).
Plaintiff has also pleaded violations of the Rehabilitation Act of 1973 § 504, 29 U.S.C. § 794, which provides in pertinent part:
No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.
Until recently it appeared that the problem of whether a private cause of action existed under the Rehabilitation Act was more of an issue with § 793 than with § 794. See generally Wolff, Protecting the Disabled Minority: Rights and Remedies Under Sections 503 and 504 of the Rehabilitation Act of 1973, 22 St. Louis U.L.J. 25 (1978). Indeed, several courts, including the Eighth Circuit, have held that an individual may bring a district court action under § 794, see, e. g., Carmi v. Metropolitan St. Louis Sewer District, 620 F.2d 672 (8th Cir. 1980) (setting forth a limited right as noted below); United Handicap Federation v. Andre, 558 F.2d 413 (8th Cir. 1977); Miener v. State of Missouri, 498 F.Supp. 949 (E.D.Mo.1980) (holding that an action for injunctive relief was permissible, whereas an action for money damages was not). See also, cases cited in Rogers v. Frito-Lay, Inc., supra, 611 F.2d at 1083. But see, Southeastern Community College v. Davis, 442 U.S. 397, 404-405 n. 5, 99 S.Ct. 2361, 2366 n. 5, 60 L.Ed.2d 980 (1979).
In Carmi v. Metropolitan St. Louis Sewer District, supra, however, the Eighth Circuit limited the private right of action, holding that an individual plaintiff in an employment situation did not have standing to bring a § 794 action unless a primary purpose of the defendant's federal funding was to provide employment. The Court based its decision on the fact that the Rehabilitation *150 Act had, in § 794a(a)(2), made available to persons aggrieved under the Act the remedies of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. It is in Title VI that we find the limitation that actions be brought only against recipients "where a primary objective of the Federal financial assistance is to provide employment." § 2000d-3. Id., at pp. 674-675. Cf. Trageser v. Libbie Rehabilitation Center, Inc., 590 F.2d 87 (4th Cir. 1978), cert. denied, 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979). But see, Carmi v. Metropolitan St. Louis Sewer District, supra, at pp. 676-680 (McMillian, J., concurring); Hart v. County of Alameda, supra. In our case the parties have stipulated that the Department receives federal funds, and even the defendants have noted in their proposed findings of fact and conclusions of law that the Department receives funds within the meaning of § 794. Additionally, the Court concludes that a primary purpose of the Department's funding from all sources is to provide employment for commissioned police officers. Accordingly, the Court concludes that plaintiff has standing to bring his § 794 action.
We therefore reach the question of liability under § 794. In his argument plaintiff argues that, by virtue of his police training and experience prior to his paralyzing accident, he is an "otherwise qualified" individual within the meaning of § 794, who has been discriminated against "solely by reason of his handicap." The Court notes here that plaintiff is a "handicapped individual" within the meaning of 29 U.S.C. § 706(7); in fact, there has been no dispute on that issue.
Plaintiff also avers that he is entitled to reinstatement as a commissioned officer under the rule set forth in the federal regulations passed pursuant to the Rehabilitation Act, specifically under 45 C.F.R. § 84.12(a) (1979):
Reasonable Accommodation
(a) A recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program.
Even by the terms of § 84.12(a), therefore, the Court must first determine that the employee or applicant is "otherwise qualified" in order to measure the need for reasonable accommodation for the individual in regard to the question of undue hardship to the recipient-employer.
Recently the Supreme Court set out its construction of the terms "otherwise qualified" in its unanimous opinion in Southeastern Community College v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). Although the specific factual context of that case involved an educational program rather than an employment situation, the Court's analysis deals with language of § 794 for federally funded programs, and is therefore applicable to our situation.
In Davis the respondent suffered from a "bilateral sensori-neural hearing loss," and was able, with a hearing aid, to detect "gross sounds occurring in the listening environment" and could discern "speech spoken to her, when the talker gets her attention and allows her to look directly at the talker." Id. at 401, 99 S.Ct. at 2364 (citations omitted). Despite the fact that she was already trained as a Licensed Practical Nurse and had had some small experience in the field, (Id. at 401 n. 1, 99 S.Ct. at 2364 n. 1) it was determined that it would be unsafe to allow her to function as a practicing nurse and she was therefore rejected from Southeastern's Associate Degree Nursing program. Had she completed the program successfully, she would have been eligible for certification as a Registered Nurse in North Carolina. Id. at 400-402, 99 S.Ct. at 2364-2365. Hence respondent was in a position quite similar to our plaintiff: she had received some training in her field; she had the ability to perform some of the tasks required as a nurse; however, because of the hearing problem it was determined that she could not function in "many situations" as a nurse and was therefore rejected. Id. at 403, 99 S.Ct. at 2365, quoting from the findings of the District Court, *151 Davis v. Southeastern Community College, 424 F.Supp. 1341, 1343 (E.D.N.C.1976).
In interpreting the phrase "otherwise qualified handicapped individual" the Supreme Court noted that "mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context." Southeastern Community College v. Davis, supra, 442 U.S. at 405, 99 S.Ct. at 2366 (footnote omitted). The Court went on to hold that "[a]n otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap" (emphasis supplied). Id. at 406, 99 S.Ct. at 2367.
The Court then turned to the administrative regulations promulgated by the Department of Health, Education and Welfare (since renamed the Department of Health and Human Services) pursuant to § 794 to determine what, if any, modifications or accommodations might be required of Southeastern in order to admit the respondent. On the issue of whether affirmative action regarding the "accommodation [to] the needs of handicapped individuals" was even required under § 794 the Court said:
Here neither the language, purpose, nor history of § 504 [29 U.S.C. § 794] reveals an intent to impose an affirmative action obligation on all recipients of Federal funds. Accordingly, we hold that even if HEW has attempted to create such an obligation itself, it lacks the authority to do so. Id. at 411-412, 99 S.Ct. at 2369.
The Court then concluded by noting that there may well be a situation in which the "refusal to modify an existing program might become unreasonable and discriminatory" but found no such violation on the part of Southeastern. Id. at 413, 99 S.Ct. at 2370.
In our case, as noted above, the situation is quite similar despite the fact that we deal with an employment situation under § 794 rather than an educational program. In short, plaintiff has shown that he is able to perform many of the tasks of the job of a commissioned police officer with the Department, and, indeed, nearly all of the tasks of some of its very small bureaus without much accommodation at all. But even he admits that his handicap prevents him from performing nearly all of the physical requirements required by the Department. Furthermore, the record shows that the modifications the Department would have to make in order to accommodate plaintiff would be substantial in that it would have to restructure its transfer policy and keep plaintiff in certain small areas, and also provide extra support for him in the event that an emergency arose which would require physical agility.
In view of the facts of this case and the holding of the unanimous Supreme Court in Davis, the Court concludes that a finding for defendants is required.
As a final point plaintiff has argued, particularly in his post trial brief, that his "due process rights to employment" have been denied, such violation amounting to an abridgement of his rights under the Fourteenth Amendment and 42 U.S.C. §§ 1983 and 1985. As a basis he cites to the Court, inter alia, the case of Duran v. City of Tampa, 430 F.Supp. 75 (M.D.Fla.1977).
In Duran the Court dealt with a complaint under 29 U.S.C. §§ 793 and 794 and the Fourteenth Amendment in which an applicant to the Tampa, Florida police department was turned down because of a history of epilepsy. Although the Court denied a preliminary injunction, it did so only because it did not find the irreparable injury required for such extraordinary relief. Id. at 79. Significantly, the Court did find a likelihood of success on the merits of plaintiff's complaint, despite the fact that it did not deal at length with any issue regarding a private right of action under the sections of the Rehabilitation Act.
In concluding that plaintiff had shown a likelihood of success on the merits the Court noted that plaintiff, who did have epileptic episodes in 1958 and 1959, had not had a single seizure since 1959 and in fact had stopped taking any medicine for epilepsy in July, 1966 (the police department application was made in April, 1975). Id. at 76. As such, it appeared to the Court that plaintiff's rejection was based on an "irrebuttable *152 presumption to exclude all individuals from employment who have suffered from epilepsy." Id. at 77 [citing for the proposition that irrebuttable presumptions are improper, Cleveland Board of Education v. La Fleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) and Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).]
Implicit in the Duran Court's opinion is the fact that the plaintiff in that case could presumably perform all the tasks required of a Tampa policeman at the time of his application. Our situation is clearly different in light of plaintiff's present condition. And, regardless of any medical standards used by the Department in other situations, it is clear that plaintiff has not been the victim of an improper irrebuttable presumption, especially in light of the record developed in this case and, in particular, the examination and report of Dr. Hardy. See Finding of Fact No. 15, supra.
Assuming, arguendo therefore, that a substantive due process right to employment exists, the record in this case, particularly in light of the facts and this Court's conclusions regarding 29 U.S.C. §§ 793 and 794, shows that defendants have not acted in violation of the Constitution in their treatment of plaintiff. Accordingly, judgment will be entered for the defendants on plaintiff's Constitutional claims as well as the claims under the Rehabilitation Act of 1973.
Finally, plaintiff has requested attorneys' fees in this action. The Court notes, however, that fees are not allowed for a party unless that party prevails, despite the excellence of the services rendered. 29 U.S.C. § 794a(b); 42 U.S.C. § 1988.