**NORTH HAVEN BOARD OF EDUCATION, Plaintiff-Appellee,**

v.

**Shirley M. HUFSTEDLER et al., Defendants-Appellants.**

**TRUMBULL BOARD OF EDUCATION, Plaintiff-Appellee,**

v.

**UNITED STATES DEPARTMENT OF EDUCATION and Linda Potz, Defendants-Appellants.**

**Nos. 1022–1024, Dockets 79–6136, 79–6247 and 79–7747.**

United States Court of Appeals, Second Circuit.

Argued April 24, 1980.

Decided July 24, 1980.

Marie E. Klimesz, U.S. Dept. of Justice, Washington, D.C. (Drew S. Days III, Asst. Atty. Gen., Washington, D.C., Richard Blumenthal, U.S. Atty., D. Connecticut, New Haven, Conn., and Brian K. Landsberg, U.S. Dept. of Justice, Washington, D.C., of counsel), for defendants-appellants Shirley M. Hufstedler et al. and United States Dept. of Ed.

Beverly J. Hodgson, Bridgeport, Conn. (Koskoff, Koskoff & Bieder, Bridgeport, Conn., of counsel), for defendant-appellant Linda Potz.

Susan K. Krell, Hartford, Conn. (Siegal, O'Connor & Kainen, Hartford, Conn., of

counsel), for plaintiff-appellee North Haven Bd. of Ed.

Paul E. Knag, Bridgeport, Conn. (Cummings & Lockwood, Richard W. Rutherford, Bridgeport, Conn., of counsel), for plaintiff-appellee Trumbull Bd. of Ed.

Before KAUFMAN and OAKES, Circuit Judges, and TENNEY, District Judge.*

OAKES, Circuit Judge:

Cognizant that four other courts of appeals and a number of district courts have held otherwise, we nevertheless are convinced after extreme care and consideration that regulations issued by the United States Department of Health, Education and Welfare (HEW) [1] concerning sex discrimination in educational employment are valid under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.,* as properly construed. Accordingly, we reverse the decisions of the United States District Court for the District of Connecticut, Ellen Bree Burns, Judge, which declared those regulations invalid and which enjoined HEW from withholding educational funding from two Connecticut school districts, North Haven and Trumbull, respectively.

FACTS

Two separate cases are here involved and they will be treated separately for factual purposes even though they both involve the same essential legal question.

I. *North Haven*—North Haven receives federal financial aid for its educational programs and activities, and hence is governed by the provisions of Title IX of the Education Amendments of 1972, 20 U.S.C § 1681 *et seq.,* barring discrimination on the basis of sex. Since the 1975–76 school year, North Haven has used between 46.8% and 66.9% of its federal financial assistance to

---

* Of the Southern District of New York, sitting by designation.

1. At the time these suits were brought and appealed, the regulations in question were printed at 45 C.F.R. Part 86, Subpart E, under the auspices of HEW. Since the jurisdiction over educational matters was transferred to the new Department of Education on May 4, 1980, these regulations have been reissued in identical form by that department at 34 C.F.R. Part 106, Subpart E, 45 Fed.Reg. 30802 (May 9, 1980). To be consistent with the briefs of the parties and the district court decision, however, we will continue to refer throughout this opinion to the regulations promulgated by HEW and to HEW's authority under Title IX.

pay salaries of its employees and is expected to continue doing so.

On January 10, 1978, in response to a private complaint alleging that the North Haven Board of Education was violating Title IX by refusing to rehire a tenured teacher who had taken a one-year maternity leave, HEW requested North Haven to provide specific information concerning its policies on hiring, leaves of absence, seniority, and tenure. North Haven did not do so, asserting that HEW lacked authority to regulate employment practices under Title IX. When HEW notified the school district that the matter had been referred to its appropriate office for possible administrative enforcement proceedings, North Haven brought this action seeking declaratory and injunctive relief. The complaint alleged that the promulgation by HEW of the regulations contained in 45 C.F.R. Part 86, Subpart E, "was in excess of the statutory authority conferred by Congress in Section 902" of Title IX, 20 U.S.C. § 1682. After HEW moved in the alternative for dismissal or summary judgment and North Haven filed a cross-motion for summary judgment, the district court granted North Haven's motion for summary judgment on April 26, 1979.

II. *Trumbull*—Appellant Linda Potz, a former guidance counselor in the Trumbull public schools, filed an administrative complaint with HEW alleging that the Trumbull Board of Education had discriminated against her on the basis of sex by giving her inferior job assignments, by providing her with inferior working conditions, and by not renewing her contract. The Trumbull board acknowledged receiving "substantial" federal financial assistance, although it is

unclear how much, if any, of that assistance was used for guidance counseling. HEW determined that Trumbull had indeed violated Title IX by requiring Potz to perform typing and to run errands not required of male counselors, by moving her office to a smaller, poorly heated, and less comfortable space in the gymnasium away from the other counselors, by asking her to change a report showing that she had seen many more students in a given week than the number seen by her male counterparts, and by not renewing her contract on the basis of her sex. On September 20, 1978, HEW notified the board that the school district was in violation of Title IX and ordered Trumbull to take corrective action including the reinstatement of Potz. Trumbull did not take such corrective action and instead filed this action for declaratory and injunctive relief against both HEW and Potz challenging HEW's authority to issue Subpart E, as in the North Haven case. The district court granted Trumbull's motion for summary judgment on May 24, 1979, based on its prior decision in North Haven, and on September 13, 1979, denied Potz's timely-filed motion to set aside the prior order of summary judgment and denied her motion for summary judgment.

THE DECISION BELOW

In each case, the district court declared Subpart E invalid and enjoined the federal defendants from interfering with federal financial assistance to plaintiffs for any alleged noncompliance with Subpart E. In holding that the prohibitions of Title IX do not apply to employment practices of educational institutions, the district court reached the same conclusion reached by a number of other courts.[2]

2. *Seattle University v. HEW*, 621 F.2d 992 (9th Cir. 1980) (per curiam) (affirming 16b FEP Cases 719 (W.D.Wash.1978)); *Romeo Community Schools v. HEW*, 600 F.2d 581 (6th Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979) (affirming 438 F.Supp. 1021 (E.D.Mich.1977)); *Junior College District of St. Louis v. Califano*, 597 F.2d 119 (8th Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979) (affirming 455 F.Supp. 1212 (E.D. Mo.1978)); *Islesboro School Committee v. Califano*, 593 F.2d 424 (1st Cir.), *cert. denied*, 444

U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 387 (1979) (affirming *Brunswick School Board v. Califano*, 449 F.Supp. 866 (D.Me.1978)); *Grove City College v. Harris*, No. 78–1293 (W.D.Pa. March 10, 1980); *Auburn School District v. HEW*, No. 78–154 (D.N.H. March 29, 1979), *appeal dismissed*, No. 79–1261 (1st Cir. 1980); *Board of Education of Bowling Green City District v. HEW*, No. C78–177, 19 FEP Cases 457 (N.D. Ohio March 14, 1979); *University of Toledo v. HEW*, 464 F.Supp. 693 (N.D.Ohio 1979); *Dougherty County School System v. Califano*,

Section 901(a) of Title IX, 20 U.S.C. § 1681(a), provides:

No person in the United States . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, . ‥

In first granting summary judgment to North Haven, the district court relied principally on the reasoning of another district court in *Romeo Community Schools v. HEW*, 438 F.Supp. 1021 (E.D.Mich.1977), *aff'd*, 600 F.2d 581 (6th Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979). The district court held that § 901(a) "does not cover the employment practices of educational institutions," but rather only prohibits "sex discrimination against students and other direct beneficiaries of federal educational assistance funds." Aware that Title IX was patterned after Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, but without a provision similar to § 604 of Title VI excluding employment from the coverage of the statute,[3] the district court concluded that such a provision was omitted from Title IX because it would have been inconsistent with other portions of the Title IX legislative

package pertaining to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and to the Equal Pay Act, 29 U.S.C. § 206(d), rather than because Congress intended that employment be covered under § 901. The court also noted that § 901(a) on its face "addressed itself only to sex discrimination against the participants in and the beneficiaries of federally assisted education programs," and that the express exclusions from coverage of § 901(a)[4] "relate solely to student activity or enrollment."

The court further relied on the fact that "[t]ermination of federal funds is the only sanction authorized" under Title IX and wondered whether Congress would have authorized termination of funds for a school program, thereby penalizing the students, where more effective and less costly alternative methods of prohibiting employment discrimination were readily available. *See* Kuhn, *Title IX: Employment and Athletics Are Outside HEW's Jurisdiction*, 65 Geo. L.J. 49, 61–62 (1976). Moreover, under § 902 of the Act, 20 U.S.C. § 1682, the district court noted that any termination of funds is "limited in its effect to the particular program, or part thereof, in which . . noncompliance has been . . . found,"[5] and that regulation of employ-

No. 78 30 ALB, 19 FEP Cases 688 (M.D.Ga. August 22, 1978), *appeal docketed*, No. 78 3384 (5th Cir. Nov. 1, 1978).

3. Section 604 of Title VI, 42 U.S.C. § 2000d 3 provides:
   Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

4. Section 901(a) contains nine express exclusions from coverage under the basic prohibition, none of which specifically mentions employment.

5. Section 902 of Title IX, 20 U.S.C. § 1682, provides:
   Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract

other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has

ment practices is inherently "nonprogram specific." In ruling against appellants, the court also noted that because Subpart E prohibits discriminatory employment practices "for their own sake" these regulations cannot be upheld on the so-called "infection theory" utilized in other cases—*i. e.*, that employment discrimination has an adverse effect upon the students themselves.[6]

Later, in a separate opinion ruling in favor of Trumbull, the district court concluded that the Supreme Court's decision in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (Title IX permits private right of action), did not affect its ruling, and adopted the reasoning of the court of appeals in *Romeo Community Schools v. HEW*, 600 F.2d 581 (6th Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979), rejecting HEW's interpretation of the legislative history of Title IX. In the district court's view, the legislative history suggested "that Title IX's focus was upon students and other direct beneficiaries."

## DISCUSSION

■ As in any other problem of statutory interpretation we must examine the words of the statute, the legislative history, and the statutory purpose to be served. We may also be aided by examining analogous statutes or statutes *in pari materia* as well as by applicable canons of construction, one of which in the immediate context is to give due weight to the contemporaneous construction of a statute by the agency charged with its administration. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–275, 94 S.Ct. 1757, 1761–2, 40 L.Ed.2d

134 (1974); *Griggs v. Duke Power Co.*, 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–5, 28 L.Ed.2d 158 (1971). In determining what weight is due, however, as Judge Learned Hand once put it:

it is doubtful whether in the end one can say more than that there comes a point at which the courts must form their own conclusions. Before doing so they will, of course,—like the administrative tribunals themselves—look for light from every quarter, and after all crannies have been searched, will yield to the administrative interpretation in all doubtful cases; but they can never abdicate.

*Niagara Falls Power Co. v. FPC*, 137 F.2d 787, 792 (2d Cir.), *cert. denied*, 320 U.S. 792, 64 S.Ct. 206, 88 L.Ed. 477 (1943).

■ HEW argues that the language of § 901(a) clearly encompasses employment discrimination. The argument is that the general category of "person[s]" protected by § 901(a), 20 U.S.C. § 1681(a), is not limited to any particular class of persons and is subject only to the nine express exclusions set out thereafter. Obviously the persons include students and, HEW argues, equally clearly include employees of a university, college or school district who are in a position to "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under" federally funded education programs or activities. However, this language is more ambiguous than HEW suggests. The First Circuit, for example, thought in *Islesboro School Committee v. Califano*, 593 F.2d 424, 426 (1st Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 387 (1979), that this lan-

been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legis-

lative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

6. *See Caulfield v. Board of Education of the City of New York*, 583 F.2d 605, 610–11 (2d Cir. 1978); *United States v. Jefferson County Board of Education*, 372 F.2d 836, 882–86 (5th Cir. 1966), *adopted en banc per curiam*, 380 F.2d 385 (5th Cir.) *cert. denied*, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

guage, "on its face, is aimed at the beneficiaries of the federal monies, *i. e.*, either students attending institutions receiving federal funds or teachers engaged in special research being funded by the United States government." Indeed, it was due to the ambiguity of the virtually identical language in § 601 of Title VI, 42 U.S.C. § 2000d, and the confusion generated by it, that Congress found it necessary later to enact § 604 of Title VI, 42 U.S.C. § 2000d–3, barring application of Title VI to employment. *See* Kuhn, *supra*, 65 Geo.L.J. at 53–54. We hence must look beyond the language of the statute itself to determine its meaning.

HEW argues that its interpretation of § 901(a) is supported by the fact that none of the nine specific exemptions from the coverage of the statute contained in § 901(a)(1)–(9), 20 U.S.C. § 1681(a)(1)–(9), removes employment from the basic prohibition. We note that Paragraphs (a)(3) and (4) exclude religious and military institutions from the application of the statute and that the remaining exclusions exempt certain practices of otherwise covered institutions. It is true as HEW contends that none of these exemptions addresses the question of employment discrimination or in any way suggests that employment practices are excluded from the basic prohibition of the statute. But, as the Sixth Circuit has said, this argument "cuts both ways." *Romeo Community Schools, supra*, 600 F.2d at 584. While we cannot agree with HEW that the failure of the exclusions to mention employment is clear support for its position, we also cannot agree with the Sixth Circuit that because the exceptions relate to students "[i]t may be fairly assumed" that only students are the subject of § 901. *Id.* Indeed, Paragraphs (a)(3) and (4) do not mention students at all,

but rather exempt entire categories of institutions. The Sixth Circuit's "assumption" is precisely that, and whether it is "fair" or not depends on the legislative history and purpose of Title IX.

HEW is on somewhat firmer footing when it argues that although Title IX is modeled after Title VI of the Civil Rights Act of 1964, *see Cannon v. University of Chicago, supra*, 441 U.S. at 694–96, 99 S.Ct. at 1956–57, Title IX conspicuously omits Title VI's exclusion of employment practices contained in 42 U.S.C. § 2000d–3,[7] even though the House proposed to include an equivalent provision in Title IX.[8] But the First and Sixth Circuits, as well as the court below, have taken the position that the House proposal was not ultimately included in Title IX because it would have been inconsistent with the sections of Title IX pertaining to employment discrimination under Title VII of the 1964 Civil Rights Act and the Equal Pay Act. *Islesboro School Committee, supra*, 593 F.2d at 428; *Romeo Community Schools, supra*, 600 F.2d at 584. *See also* Kuhn, *supra*, 65 Geo.L.J. at 57 ("The inclusion of section 904 in the bill was nothing more than a drafting mistake.") Again, we are pointed to a careful examination of the legislative history and purpose of the statute to determine whether HEW's conclusion or that of these other courts is the correct one.

In our view the legislative history, closely examined, supports HEW rather than the various court decisions which we have mentioned above. The Supreme Court has informed us of the overall objectives Congress sought in enacting Title IX:

> First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices. *Cannon, supra*, 441 U.S. at 704, 99 S.Ct. at 1962.

---

7. *See* note 3 *supra*.

8. *See* H.R.Rep.No. 554, 92d Cong., 1st Sess., *reprinted in* 1972 U.S.Code Cong. & Admin. News, pp. 2462, 2566. The Conference Committee Report contains the following:

(f) In addition, the House amendment, but not the Senate amendment, provided that nothing in the title authorizes action by any

department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment. The House recedes.

*Id.* at 2671–72.

We turn then to the actions of each House and of the conference committee to make the determination whether interpreting Title IX to cover employment discrimination is consistent with these congressional objectives.

When we look at the Senate we note that on August 5, 1971, Senator Bayh introduced an amendment to a pending higher education bill, S. 659, for the purpose of prohibiting sex discrimination by certain educational institutions. In introducing his amendment he stated:

> While over 50 percent of our population is female, there is no effective protection for them as they seek admission *and employment* in educational facilities. The antidiscrimination provisions of the Civil Rights Act of 1964 do not deal with sex discrimination by our institutions of higher learning.
>
> \* \* \* \* \* \*
>
> Today, women seeking *employment* in higher education face an array of obstacles almost as insuperable as those which used to face blacks.

117 Cong.Rec. 30155–56 (1971) (emphasis added). The next day, Senator McGovern stated his support for Senator Bayh's amendment, and in doing so referred to statistics that only nine percent of America's college professors were women, only six percent of law school students were women, and only eight percent of medical school students were women. 117 Cong.Rec. 30411 (1971). Senator Bayh's 1971 amendment did not come to a vote, since it was ruled "nongermane." *See* 118 Cong.Rec. 5808 (1972). Senator Bayh's remarks quoted above indicate at least an initial intention on his part to prohibit employment discrimination under the provision of his 1971 amendment which subsequently formed the basis of § 901.

Senator Bayh introduced a new version of his amendment on February 28, 1972, as Amendment No. 874 to S. 659, which was still under consideration by Congress. 118 Cong.Rec. 5802–03 (1972). In addition to the provisions of the 1971 proposal, Senator Bayh included provisions amending Title VII of the Civil Rights Act of 1964 and amending § 13(a) of the Fair Labor Standards Act, 29 U.S.C. § 213(a), to exempt from the scope of that subsection the Equal Pay Act, 29 U.S.C. § 206(d).[9] The amendment was passed by the Senate the same day it was introduced. 118 Cong.Rec. 5815 (1972).

In introducing his amendment, Senator Bayh stated that "sex discrimination reaches into all facets of education—admissions, scholarship programs, *faculty hiring and promotion, professional staffing*, and pay scales." 118 Cong.Rec. 5803 (1972) (emphasis added). The Senator went on to say:

> Amendment No. 874 is broad, but basically it closes loopholes in existing legislation relating to general education programs *and employment resulting from those programs* . . . . More specifically, *the heart of this amendment* is a provision banning sex discrimination in educational programs receiving Federal funds. The amendment would cover such crucial aspects as admissions procedures, scholarships, and *faculty employment, with limited exceptions*. Enforcement powers include fund termination provisions—and appropriate safeguards—parallel to those found in title VI of the 1964 Civil Rights Act. *Other important provisions* in the amendment would extend the equal employment opportunities provisions of title VII of the 1964 Civil Rights Act to educational institutions, and extend the Equal Pay for Equal Work Act to include executive, administrative and professional women.

---

**9.** That portion of Senator Bayh's amendment dealing with Title VII, contained in § 1005 of the amendment, was not ultimately enacted as part of Title IX because a similar provision had already been enacted as §§ 2 and 3 of the Equal Employment Opportunity Act of 1972, 42 U.S.C. §§ 2000e(a) and 2000e-1. The portion of the amendment dealing with the Equal Pay Act, contained in § 1009 of the amendment, was enacted as § 906(b)(1) of Title IX and is now part of 29 U.S.C. § 213(a).

*Id.* (emphasis added). Other courts have interpreted these remarks concerning the coverage of employment to refer not to the part of Senator Bayh's amendment that later became § 901(a) of Title IX, 20 U.S.C. § 1681(a), but rather to the amendment's provisions removing the exemption in Title VII for educational institutions and extending the protection of the Equal Pay Act to executive, administrative and professional positions. But Senator Bayh in his quoted remarks quite clearly referred to "faculty employment" in conjunction with the basic prohibition of his amendment and *then* referred to the "[o]ther important provisions" dealing with Title VII and the Equal Pay Act.

After making these introductory remarks, Senator Bayh in a prepared summary of his amendment divided the amendment into four parts and discussed each separately. 118 Cong.Rec. 5806–08 (1972). The first part of his summary is labeled "A. Prohibition of Sex Discrimination in Federally Funded Education Programs." Under this heading, Senator Bayh describes the

basic prohibition against sex discrimination and the enforcement provisions, noting that these sections "generally parallel the provisions of title VI." *Id.* at 5807. He also discusses the exclusions from coverage in this category. It is in the second part of his discussion, labeled "B. Prohibition of Education Related Employment Discrimination," that Senator Bayh describes the amendments to Title VII and the Fair Labor Standards Act. While these headings at first blush tend to support the other courts' view, Senator Bayh's description of the *first* portion of his amendment shows that the basic prohibition of § 901 was meant to apply to employment discrimination:

> This portion of the amendment covers discrimination in all areas where abuse has been mentioned—*employment practices for faculty and administrators, scholarship aid, admissions, access to programs within the institution such as vocational education classes, and so forth.*

*Id.* (emphasis added).[10] This language strongly indicates that the first portion of

---

10. Senator Bayh made the following observations in introducing his revised amendment:

> I believe it is important to survey in some detail the scope of the problem in certain fundamental areas—hiring, scholarships and admissions.
> A. Discrimination in Hiring and Promotion of Faculty and Administrators
> Discrimination against females on faculties and in administration is well documented and widespread abuse is clear. I have been dismayed to learn of the double standard the academic community has applied to those women who choose to make education their life work. In spite of high academic standards, a woman who has met the rigorous standards for a Ph.D. program may suddenly find that these same schools do not have sufficient confidence in their own standards to hire the graduate to teach. A recent report on Columbia University practices found that although the percentage of doctorates awarded to women rose from 13 to 24 percent between 1957 and 1968, the percent of women in tenured positions at the graduate facilities have remained constant—at slightly over 2 percent. Similar situations exist, according to testimony during the 1970 hearings at numbers of other schools.
> Although women comprised 6.9 percent of those enrolled in law school in 1969, a survey of 36 prominent law schools during 1968–70 showed that out of a total of 1,625 faculty

members, only 35 or 2.1 percent were women, and 25 percent of those 36 were classified as librarians.

. . . . .

> Furthermore, the rule is that once hired, women do not receive advancement as often as men. While almost half of the male teachers are given the status of full professor, only 10 percent of the women make it that far. As a result, the highest faculty ranks are weighted with men; the lowest rank with women:

| Present Rank | Men | Women |
|---|---|---|
| Professor | 24.5% | 9.4% |
| Associate professor | 21.9% | 15.7% |
| Assistant professor | 28.2% | 28.7% |
| Instructor and below | 25.3% | 46.2% |

> Finally, those women who are promoted often do not receive equal pay for equal work. In 1965–66, at the instructor's level, the median annual salary of women was $410 less than that of male instructors; at the assistant professor's level it was $576 less; at the associate professor's level, $742 less; and at the level of full professorship, it was $1,119 less. "Fact Sheet on the Earnings Gap," U.S. Department of Labor, Women's Bureau, 1970. According to testimony submitted during the "1970 Hearings," the women at the University of Pittsburgh calculated that the University was saving $2,500,000 by

the Act, containing § 901 and its enforcement provisions, relates not only to discrimination against students and other beneficiaries, but also to "employment practices for faculty and administrators." The *second* portion applies "title VII's widely recognized standards of equality of employment opportunity to educational institutions" and ensures that "both men and women employees receive equal pay for equal work" at such institutions. *Id.*[11]

While we are well aware of Justice Jackson's warning against selecting casual statements from floor debates, *Schwegmann Brothers v. Calvert Distillers Corp.*, 341 U.S. 384, 395–96, 71 S.Ct. 745, 751, 95 L.Ed. 1035 (1951) (Jackson, J., concurring), we at least get further reinforcement of the principal sponsor's views as expressed above by looking at the debate on the Senate floor just prior to Senate passage of Title IX. In that debate Senator Pell, the floor manager of the entire education bill, addressed several questions to Senator Bayh concerning the scope of § 1001(a) and (b) of the Bayh Amendment, the predecessors of § 901(a) and (c) of Title IX. The following colloquy leaves little doubt that Senator Bayh intended employment practices to be covered under what is now § 901:

> paying women less than they would have paid men with the same qualifications.
>
> Preference for men over women to fill administrative posts is just as clear. For instance, Dr. Peter Muirhead, Associate Commissioner of Education, testified during the "1970 Hearings" that more than two-thirds of the teachers in elementary and secondary schools are women, but they constitute only 22 percent of the elementary school principals and only 4 percent of the high school principals. According to a recent study by the National Education Association, only two women can be found among 13,000 school superintendents.
>
> In higher education, female administrators are virtually nonexistent. Dr. Ann Scott, from the University of Buffalo, highlighted the "progressive evaporation of women as we climb the academic ladder" by pointing out that while women are only 5 percent of the full professors at that institution, they are even less—1 percent—of the top administration "1970 Hearings." [*Sic.*] Even at women's colleges there has been a decline in recent years in the number of high administrative posts held by women. And as Dr. Bernice Sandler pointed out in a recent

MR. PELL. . . . Sections 1001(a) and (b) include all educational institutions which receive Federal assistance. This includes elementary and secondary schools as well. With regard to private undergraduate colleges, the Senator has excluded from coverage their admissions practices. Does the same exclusion apply to nonpublic institutions at the elementary and secondary level?

MR. BAYH. At the elementary and secondary levels, admissions policies are not covered. As the Senator knows, we are dealing with three basically different types of discrimination here. We are dealing with discrimination in admission to an institution, discrimination of available services or studies within an institution once students are admitted, *and discrimination in employment within an institution, as a member of a faculty or whatever.*

*In the area of employment, we permit no exceptions.* In the area of services, once a student is accepted within an institution, we permit no exceptions. The Senator from Rhode Island asked about admissions policies of private secondary

> speech, if it were not for female presidents at Catholic colleges, the number of women college presidents would be less than the number of whooping cranes.
>
> 118 Cong.Rec. 5804–05 (1972).

11. There is some discrepancy in Senator Bayh's breakdown of his amendment. The first part of his summary begins: "Central to my amendment are sections 1001-1005 . . . ." 118 Cong.Rec. 5807 (1972). Section 1005, however, is the section of Amendment No. 874 which contains the amendments to Title VII. Thus, an argument could be made that Senator Bayh's references to employment discrimination in this first portion actually are references to § 1005 rather than to the basic prohibition. It is clear from his discussion in the first two parts of the summary, however, that the first part was not meant to cover the Title VII provision, but only the basic prohibition, the enforcement mechanism and the exclusions. The discussion of the proposed amendment to Title VII does not come until the *second* part of the summary. Accordingly, we conclude that the mention of § 1005 of the amendment in the first part of the summary was simply an oversight.

and primary schools. They would be excepted.

  * * * * * *

MR. PELL. . . . [D]o I understand the Senator to say that the faculty of private schools would have to reflect a sexual balance?

MR. BAYH. This amendment sets no quotas. It only guarantees equality of opportunity. The Senator from Indiana cannot be sure about the sexual balance in any faculty, but as far as employment opportunities are concerned, the answer would be "Yes."

  * * * * * *

MR. PELL. Would this apply to a parochial school where they have nuns *as teachers*?

MR. BAYH. No. *There is an explicit exception for education institutions controlled by a religious organization.*

  * * * * * *

MR. PELL. Mr. President, I refer to a preparatory school such as Peekskill Military Institute which is at the high school level. Would that school be expected to have *women teachers*?

  * * * * * *

. MR. BAYH. *All military schools are excluded.*

118 Cong.Rec. 5812–13 (1972) (emphasis added).

It is clear from these questions and answers not only that Senator Bayh intended employment to be covered by § 901, but also that the exemptions for religious and military institutions now contained in § 901(a)(3) and (4) apply to *employment* as well as to admissions and services. Obviously Senator Bayh's responses to Senator Pell that the employment practices of religious and military schools were covered by the exclusions in § 901(a) would make no sense if employment practices were not included within the scope of § 901(a) to begin with. Despite Justice Jackson's warning, such statements by the sponsor of a piece of legislation are at the very least helpful and may indeed be authoritative. *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760,* 377 U.S. 58, 67–68, 84 S.Ct. 1063, 1068–9, 12 L.Ed.2d 129 (1964); *Schwegmann Brothers, supra,* 341 U.S. at 394–95, 71 S.Ct. at 750–1.

We also note that one month after the Higher Education Amendments of 1972 containing Title IX were signed into law by the President, Senator Bayh published in the Congressional Record a summary of the requirements of Title IX prepared by Dr. Bernice Sandler of the Association of American Colleges. That summary's description of the basic prohibition of· § 901(a) included a footnote which noted the following differences between Title IX and Title VI:

> Apart from admission coverage . . , the Higher Education Act differs from Title VI in that the sex discrimination prohibition is limited to federally assisted *education* programs and activities, whereas the race, color and national origin discrimination prohibitions are applicable to *all* federally assisted programs. Title VI also specifically excludes *employment* from coverage (except where the primary objective of the federal aid is to provide employment). There is no similar exemption for employment in the sex discrimination provisions relating to federally assisted education programs.

118 Cong.Rec. 24684 n. 1 (1972) (emphasis in original). Thus, after the Act's passage, the primary sponsor of Title IX adopted a summary of that title which expressly noted the distinction between Titles VI and IX in terms of employment coverage.

Turning to the House of Representatives, the House version of the amendments to the Higher Education Act of 1965 was simultaneously being considered as H.R. 7248. A provision on sex discrimination in educational institutions, similar to that introduced by Senator Bayh, was included in the bill reported by the House Committee on Education and Labor. *See* H.R.Rep.No. 554, 92d Cong., 1st Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News, pp. 2462, 2511–12, 2566–67. The principal difference

was the inclusion of § 1004 in the House bill, paralleling the language of § 604 of Title VI, which we have discussed above. The House Committee report states:

Section 1004 provides that nothing in this title may be taken to authorize action by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

*Id.* at 2566 (emphasis in original). The Committee's bill was passed by the House on November 4, 1971 without any change in the provisions of § 1004 of the bill. 117 Cong.Rec. 39353–54 (1971). There was no specific discussion of § 1004 during the House debate. 117 Cong.Rec. 39248 *et seq.* (1971). As we have pointed out, this provision in the House bill went to the conference committee, and the House receded. *See* note 8 *supra.*

It is not enough, we think, to say as the court below and the other circuits have suggested that the deletion of this provision in conference was simply to avoid inconsistency with the other provisions of the bill proposing to amend Title VII and the Fair Labor Standards Act, since Congress could easily have drafted an employment exclusion applicable solely to the first portion of the Act. For example, Congress could readily have said: "Nothing in § 901 shall apply to any employees of any educational institution subject to this title except where a primary objective of the Federal financial assistance is to provide employment." In light of the ease with which an appropriate employment exclusion could have been substituted, and in light of the Senate sponsor's view of his amendment as expressed in his summary and in the debates from which we have quoted above, we cannot agree that the omission was simply correction of a "drafting mistake." Rather, the deletion of the House provision supports HEW's broader interpretation of the Act. Appellees point us to no language anywhere in the legislative history that even suggests that the conference committee deleted the provi-

sion merely for reasons of consistency, and we have not been able to find any. In short, this was *not,* in our view, a matter of simply correcting legislative inadvertence.

It is not without significance that Congress itself undertook a statutorily mandated review of the Title IX regulations which are here challenged. That review procedure provided at the time that any regulation would become effective not less than 45 days after transmission "unless the Congress shall, by concurrent resolution, find that the standard, rule, regulation or requirement is inconsistent with the Act from which it derives its authority, and disapprove such standard, rule, regulation or requirement." 20 U.S.C. § 1232(d)(1) (Supp. IV 1974). Senator Helms introduced such a concurrent resolution to disapprove all of the HEW regulations issued under Title IX including Subpart E.S.Con.Res. 46, 94th Cong., 1st Sess., 121 Cong.Rec. 17301 (1975). The resolution was referred to the Senate Committee on Labor and Public Welfare, which took no action on it. In the House, Representatives Quie and Erlenborn introduced an amendment to a concurrent resolution which amendment specifically sought to disapprove the employment sections of the regulations. Their amendment stated: "Subpart E . . . is inconsistent with the Act since by amendment to Title VII of the Civil Rights Act of 1964 and the Fair Labor Standards Act of 1938, Congress has conferred such jurisdiction upon the United States Equal Employment Opportunity Commission and the Department of Labor." Unpublished Amendment to H.R.Con.Res. 330, Hearings Before the Subcommittee on Postsecondary Education of the House Committee on Education and Labor, 94th Cong., 1st Sess. (1975) on file with that Committee. In testimony before the House Education and Labor Committee's Subcommittee on Postsecondary Education, Senator Bayh expressed support for the HEW regulations, stating that HEW's "[T]itle IX guidelines, as the Congress mandated, call for equality in admissions, financial aid,

course offerings, career counseling, *and in the case of teachers and other educational personnel, employment, pay and promotions.*" Sex Discrimination Regulations: Hearings Before the Subcommittee on Postsecondary Education of the House Committee on Education and Labor, 94th Cong., 1st Sess. 173 (1975) (emphasis added). The concurrent resolution and amendment were never passed out of the Education and Labor Committee. Thus, no concurrent resolution was passed by either House, and HEW's regulations took effect.

Subsequent attempts to limit the scope of § 901 have also failed. Later in 1975, Senator Helms introduced a bill, S. 2146, proposing to amend § 901 along the lines that we have suggested could have been used by Congress in the first instance if Congress intended to exclude employment from coverage. His bill read in part: "Nothing in [§ 901 of Title IX] shall apply to any employees of any educational institution subject to this title." 121 Cong.Rec. 23845–47 (1975). His bill was not adopted. A year later, Senator McClure offered another amendment to limit the coverage of § 901 to the "curriculum or graduation requirements of the institutions" receiving federal aid. 122 Cong.Rec. 28136 (1976). Senator Bayh made the following remarks in opposition to the amendment:

> The impact of this amendment is enormous—it would exempt those areas of traditional discrimination against women that [were] the reason for the congressional enactment of Title IX. These areas would include scholarship aid, *employment and employment benefits* and extracurricular activities such as athletics.

*Id.* at 28144 (emphasis added). Senator McClure's amendment was not adopted. *Id.* at 28147.

While Congress *later* amended the statute requiring congressional review of such regulations to provide that the failure to adopt a concurrent resolution disapproving a final regulation should not be construed as approval of the regulation or as a finding of consistency with the authorizing statute, 20 U.S.C. § 1232(d)(1), we think the failure of Congress here to adopt resolutions, *along with bills and amendments*, specifically designed to exempt employment from HEW regulation after hearing arguments on both sides provides some evidence that coverage was intended. *See Cannon v. University of Chicago, supra*, 441 U.S. at 703, 99 S.Ct. at 1961; *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14–16, 61 S.Ct. 422, 426–27, 85 L.Ed. 479 (1941). Moreover, Congress has twice amended the coverage of Title IX when it has disagreed with HEW's interpretation of the statute. 20 U.S.C. § 1681(a)(8), (9). *See NLRB v. Bell Aerospace Co., supra*, 416 U.S. at 275, 94 S.Ct. at 1762; *Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 313–14, 53 S.Ct. 350, 357–8, 77 L.Ed. 796 (1933). We recognize that this review of subsequent congressional action with respect to the regulations is not conclusive, and we agree with the First Circuit that "Congressional inaction should not be lightly construed as approval," *Islesboro School Committee v. Califano, supra*, 593 F.2d at 428 n. 3. Nonetheless, we think the congressional reaction to the Title IX regulations, in the context of the legislative history as a whole, lends some additional weight to the view that § 901 was expressly intended to relate to employment practices.

Nor is it particularly noteworthy that employment discrimination in educational institutions is now prohibited by Title VII and the Equal Pay Act. Overlapping jurisdiction in the area of employment discrimination is well recognized. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48–49, 94 S.Ct. 1011, 1019–20, 39 L.Ed.2d 147 (1974). We visualize Congress as in effect saying that individual employees may exercise their rights under either Title VII or the Equal Pay Act, but that HEW may use its powers to threaten to withdraw federal funds or actually withdraw them if necessary when a recipient of

federal financial assistance practices discrimination on the basis of sex.[12]

We recognize the argument that purports to speak both to the heart and to "common sense,"—*i. e.*, that Congress could hardly have intended to penalize the students who are primary beneficiaries of a federally funded program simply because there is discrimination against teachers or staff. While this argument may have some initial appeal, we believe it to be superficial. HEW unquestionably has the authority to withhold funds when it finds that any *student* or group of *students* has been discriminated against in any educational program even when the vast majority of students in such a program have suffered no discrimination and would be hurt by the loss of funds. It is perfectly consistent, in our view, to find that Congress has given HEW the same authority to oversee sex discrimination in educational *employment* in light of the grave congressional concern over sex discrimination in that area. *See* note 10 *supra*. As we have indicated, our reading of the statutory scheme leads us to conclude that Congress intended HEW to have available the potent remedy of fund withdrawal to ensure compliance with the prohibition against sex discrimination in employment rather than rely solely on the important, but usually piecemeal, sanctions available to aggrieved employees under Title VII and the Equal Pay Act.

Finally, while § 902 of Title IX requires that an order terminating federal financial assistance be "limited in its effect to the particular program or part thereof, in which . . . noncompliance has been . . . found," we disagree with the court below and the district court in *Romeo Community Schools, supra,* 438 F.Supp. at 1033, that this limitation "is implicitly a limitation on HEW's authority to regulate as well." Such a construction is contrary to the judicial approval given to broad HEW guidelines under Title VI of the Civil Rights Act of 1964, which also contains this language limiting fund termination. *See United States v. Jefferson County Board of Education,* 372 F.2d 836, 847–61 (5th Cir. 1966), *adopted en banc per curiam,* 380 F.2d 385, *cert. denied,* 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967). Moreover, employment discrimination is no less "program specific" than other practices recognized as subject to the provisions of Title VI and Title IX. For instance, discrimination in admissions to an institution's graduate schools is clearly prohibited by Title IX regardless of whether the discrimination occurs solely in one graduate program or all graduate programs. By the same token, *employment discrimination might occur. in one program or in more than one program.* Nothing in § 902 requires HEW only to issue regulations directed at specific programs. Rather, we think the statute merely requires that any termination of funds be limited to the particular program or programs in which noncompliance with § 901 is found and does not require HEW to specify prior to termination which particular programs receiving financial assistance are covered by its regulations.

In order to terminate federal assistance to a particular program under Title IX, HEW is required to show that there has been sex discrimination in that program. And if discrimination occurs throughout an entire educational system, that system can be considered one "program" under Title IX or Title VI for purposes of terminating funds. *See Jefferson County, supra.* But the question of the scope of HEW's authority to terminate funds is different from the

---

**12.** We note that HEW included in Subpart E an exemption similar to that contained in § 703(e) of Title VII, 42 U.S.C. § 2000e ·2(e), for those situations where sex discrimination can be justified as a "bona fide occupational qualification" (BFOQ). 45 C.F.R. § 86.61 (now 34 C.F.R. § 106.61 (May 9, 1980)). This eliminated the possible inconsistency that HEW could withdraw funds under Title IX for sex discrimination that is expressly authorized under the BFOQ exception of Title VII.

question whether HEW is authorized by § 901 of Title IX to issue broad regulations prohibiting sex discrimination in employment. The latter question we answer in the affirmative, and hence do not reach the question whether HEW has authority to issue regulations which prohibit sex discrimination in employment to the extent that it constitutes discrimination against students—the so-called question of "infection." [13]

Because of its holding that HEW had no authority to issue employment regulations under Title IX, the district court did not take any evidence on the questions whether North Haven or Trumbull engaged in any discrimination on the basis of sex or whether, if so, any fund termination had to be limited to a particular program or particular programs. In reversing the summary judgments granted by the district court in favor of the school boards, we express no view as to whether the HEW regulations were actually violated or what remedies, if any, might be appropriate. We merely hold that HEW has authority under Title IX to promulgate the employment discrimination regulations at issue here.

We accordingly reverse the judgment below and remand the cause for further proceedings.

---

13. *See* note 6 *supra* and accompanying text.