**Thomas DAVIS, Plaintiff-Appellee,**

v.

**UNITED AIR LINES, INC.,
Defendant-Appellant.**

**No. 1346, Docket 81–7093.**

United States Court of Appeals,
Second Circuit.

Argued May 12, 1981.

Decided Sept. 17, 1981.

Michael A. Katz, New York City, for defendant-appellant.

Norman Spiegel, New York City, for plaintiff-appellee.

Before KAUFMAN, OAKES, and NEWMAN, Circuit Judges.

OAKES, Circuit Judge:

██ This case involves the issue whether section 503 of the Vocational Rehabilitation Act of 1973, as amended, 29 U.S.C. § 793,[1] gives an employee a private right of action against an employer contracting with the federal government for alleged discrimination in employment on the basis of physical handicap. The question has been answered contrarily by a number of district courts,[2] with differing views among the district judges in the Second Circuit,[3] but the only courts of appeal passing on the question, the Fifth,[4] Sixth,[5] and Seventh,[6] Circuits, have held that there is no such private judicial remedy. We agree with the extended analysis of this question by Judge Alvin Rubin for the panel majority in the Fifth Circuit in *Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074 (5th Cir. 1980), and our examination of the cases decided in the Supreme Court and in our own court since *Rogers* was handed down reenforces the conclusion in *Rogers* that no private right of action may be inferred from section 503. Accordingly, we reverse the judgment of the United States District Court for the Eastern District of New York, Jack B. Weinstein, Chief Judge, which found the reasoning of courts upholding a private right of action "persuasive" in light of the factors identified by the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). We do not reach the question whether Thomas Davis, the appellee, had failed to exhaust his administrative reme-

---

1. Section 503 provides in relevant part:

    (a) Any contract in excess of $2,500 entered into by any Federal department or agency for the procurement of personal property and nonpersonal services (including construction) for the United States shall contain a provision requiring that, in employing persons to carry out such contract the party contracting with the United States shall take affirmative action to employ and advance in employment qualified handicapped individuals ....

    (b) If any handicapped individual believes any contractor has failed or refuses to comply with the provisions of his contract with the United States, relating to employment of handicapped individuals, such individual may file a complaint with the Department of Labor. The Department shall promptly investigate such complaint and shall take such action thereon as the facts and circumstances warrant, consistent with the terms of such contract and the laws and regulations applicable thereto.

    29 U.S.C. § 793.

2. *Compare California Paralyzed Veterans Ass'n v. F. C. C.*, 496 F.Supp. 125, 131 (C.D.Cal.1980) (finding that a private right of action exists under section 503); *Clarke v. FELEC Servs., Inc.*, 489 F.Supp. 165, 169 (D.Alaska 1980) (same); *Hart v. County of Alameda*, 485 F.Supp. 66, 76 (N.D.Cal.1979) (same); *Duran v. City of Tampa*, 430 F.Supp. 75, 78 (M.D.Fla. 1977) (same); *Drennon v. Philadelphia Gen'l Hosp.*, 428 F.Supp. 809, 816 (E.D.Pa.1977) (same), *with Simon v. St. Louis County*, 497 F.Supp. 141, 149 (E.D.Mo.1980) (finding that no private right of action exists under section 503); *Doss v. General Motors Corp.*, 478 F.Supp. 139, 141 (C.D.Ill.1979) (same); *Anderson v. Erie Lackawanna Ry. Co.*, 468 F.Supp. 934, 940 (N.D.Ohio 1979) (same); *Wood v. Diamond State Tel. Co.*, 440 F.Supp. 1003, 1010 (D.Del.1977) (same).

3. *Compare Langman v. Western Elec. Co.*, 488 F.Supp. 680, 685 (S.D.N.Y.1980) (Knapp, J., finding that no private right of action exists under section 503), *with Chaplin v. Consolidated Edison Co.*, 482 F.Supp. 1165, 1173 (S.D.N.Y.1980) (Lasker, J., finding that a private right of action exists under section 503).

4. *Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074, 1085 (5th Cir. 1980), *cert. denied*, 101 S.Ct. 246 (1980).

5. *Hoopes v. Equifax, Inc.*, 611 F.2d 134, 135 (6th Cir. 1979).

6. *Simpson v. Reynolds Metals Co.*, 629 F.2d 1226, 1244 (7th Cir. 1980).

dies in this case, or the question whether this case was within the primary jurisdiction of the Department of Labor.

■ The facts as alleged in the complaint may be very briefly stated. Thomas Davis had worked for United Air Lines, Inc. ("United") since 1966 as a ramp serviceman, servicing aircraft and loading and unloading cargo. In 1969 he was diagnosed as having epilepsy and from time to time until mid-September 1974, he experienced seizures that did not interfere with his satisfactory performance of duties as a ramp serviceman. After he experienced a seizure in mid-September 1974, he was placed on restricted duties, and he was ultimately confined to working in the bag room. In June 1977, he was placed on "extended illness status" because of his epilepsy; he was officially discharged on February 15, 1980.

In December 1978 Davis filed a complaint with the Department of Labor as provided by section 503(b), note 1 *supra*, charging that United had discriminated against him on the basis of his physical handicap. The Department of Labor has not acted on his complaint. In October 1979, he filed a private suit against United in the Eastern District of New York claiming that United had violated his rights under section 503. Judge Weinstein denied United's motion for judgment on the pleadings, and certified his order for appeal in accordance with 28 U.S.C. § 1292(b). It is assumed for purposes of this appeal that Davis is physically "handicapped" within the meaning of the Act, *see* 29 U.S.C. § 706(6), that United holds government contracts subject to the requirements of section 503, and that Davis was discharged because of his handicap.

The law may be briefly stated as follows. Under section 503(a), any contract in excess of $2,500 entered into by the federal government must "contain a provision requiring that . . . [the contractor] shall take affirmative action to employ and advance in employment qualified handicapped individuals. . . ." 29 U.S.C. § 793(a). Section 503(b) provides that if any handicapped individual "believes any contractor has failed or refuse[d] to comply with the provisions of his [federal] contract," that "such individual may file a complaint with the Department of Labor" which shall "promptly investigate" and "take such action . . . as the facts and circumstances warrant. . . ."

Because section 503 creates no explicit private judicial remedy against federal contractors charged with employment discrimination against the handicapped, the federal courts have had to determine whether a private right of action may be inferred. The starting points for our analysis must be the four factors set out in *Cort v. Ash*, whether we view these factors as "a part of our law," *California v. Sierra Club*, 451 U.S. 287, 301, 101 S.Ct. 1775, 1783, 68 L.Ed.2d 101 (1981) (Stevens, J., concurring), or as "merely guides in the central task of ascertaining legislative intent," *id.* at 302, 101 S.Ct. at 1783 (Rehnquist, J., concurring in the judgment). *See Texas Industries v. Radcliff Materials, Inc.*, 451 U.S. 630, 639, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981). Analysis of the *Cort* factors is the "preferred approach" for determining whether an implied private right of action exists. *See Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 26, 100 S.Ct. 242, 250, 62 L.Ed.2d 146 (1979) (White, J., dissenting); *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

Under *Cort* the initial consideration is whether the plaintiff is a member of a class for "whose *especial* benefit the statute was enacted." *Cort v. Ash*, 422 U.S. at 78, 80–82, 95 S.Ct. at 2087, 2089. *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 569–70, 99 S.Ct. 2479, 2484–85, 61 L.Ed.2d 82 (1979). Although section 503 was generally intended to benefit handicapped persons, that alone does not establish that Congress intended to "create a federal right in favor of the plaintiff." *Cort v. Ash*, 442 U.S. at 78, 95 S.Ct. at 2088. *See Rogers v. Frito-Lay, Inc.*, 611 F.2d at 1079.

The Supreme Court has suggested that a private right of action may be more readily implied when the language of a statute is "right-creating" rather than merely "duty-creating." *See Cannon v. University of*

*Chicago*, 441 U.S. at 690 n. 13, 99 S.Ct. at 1954. Statutory language has been found right-creating when it focuses explicitly on the benefited class. *See, e. g., id.* at 682 n. 3, 99 S.Ct. at 2487 ("no person . . . shall, on the basis of sex, be excluded . . . ," 20 U.S.C. § 1681); *Allen v. State Board of Elections*, 393 U.S. 544, 554–55, 89 S.Ct. 817, 825–26, 22 L.Ed.2d 1 (1969) ("no person shall be denied the right to vote . . . ," 42 U.S.C. § 1973c).

Section 504 of the Vocational Rehabilitation Act of 1973, 29 U.S.C. § 794, which is not at issue in this case, invokes just such right-creating language: "No otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Accordingly, a number of courts have held that section 504 creates a private cause of action for handicapped persons.[7]

By contrast, section 503 contains only duty-creating language, directing federal departments and agencies to provide in all federal contracts that contractors are obligated to take affirmative steps to employ and advance handicapped persons. Nowhere does section 503 confer an express right upon the handicapped, nor impose a direct duty on federal contractors. *See Rogers v. Frito-Lay, Inc.*, 611 F.2d at 1079–80. As Judge Rubin noted in *Rogers*, the use of duty-creating rather than right-creating phrases, though "not conclusive," makes "inference of a private cause of action more difficult." *Id.* at 1080. Indeed, the Supreme Court has stated that language such as that contained in section 503 militates against inferring a private right of action:

> There would be far less reason to infer a private remedy in favor of individual persons if Congress, instead of drafting Title

IX with an unmistakable focus on the benefited class, had written it simply as a ban on discriminatory conduct by recipients of federal funds or as a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices.

*Cannon v. University of Chicago*, 441 U.S. at 690–93, 99 S.Ct. at 1954–55.

The second inquiry under *Cort* is whether there is any legislative history evidencing congressional intent to create or deny a private remedy. We read *Cort* and its progeny, including *California v. Sierra Club, supra,* and *Universities Research Ass'n, Inc. v. Coutu,* 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981) (no private right of action under Davis-Bacon Act against private employers) as requiring a very close, even microscopic, examination of the legislative history of the particular statute involved. This reading of the legislative history must be done with an enlightened judicial eye, giving full attention to the underlying congressional purpose, the very heart of statutory analysis, *see* Cox, *Judge Learned Hand and the Interpretation of Statutes,* 60 Harv. L.Rev. 370, 374–75 (1947); Wyzanski, *Judge Learned Hand's Contributions to Public Law,* 60 Harv.L.Rev. 348, 360–62 (1947); *WATCH v. Harris,* 603 F.2d 310 (2d Cir.), *cert. denied,* 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979), but also with a healthy skepticism of "casual statements from floor debates," as Justice Jackson warned us so pointedly in *Schwegmann Bros. v. Calvert Distillers Co.,* 341 U.S. 384, 396, 71 S.Ct. 745, 751, 95 L.Ed. 1035 (1951).

Taking such a view of section 503, we find nothing in the history of the original Rehabilitation Act of 1973 that casts any light on whether Congress intended to create a private right of action. Given Congress's initial silence, we may seek some guidance from the 1974 and 1978 amend-

---

7. *See, e. g., United Handicapped Federation v. Andre*, 558 F.2d 413, 415 (8th Cir. 1977); *Kampmeier v. Nyquist*, 553 F.2d 296, 299 (2d Cir. 1977); *Lloyd v. Regional Transp. Auth.*, 548 F.2d 1277, 1287 (7th Cir. 1977); *Davis v. Bucher*, 451 F.Supp. 791, 797 (E.D.Pa.1978); *Doe v. New York Univ.*, 442 F.Supp. 522, 523 (S.D.N.Y.1978); *Barnes v. Converse Coll.*, 436 F.Supp. 635, 638 (D.S.C.1977); *Gurmankin v. Costanzo*, 411 F.Supp. 982, 989 (E.D.Pa.1976), *aff'd*, 556 F.2d 184 (3d Cir. 1977).

ments to the Act. In giving weight to these amendments, we would choose a middle road between the panel majority in *Rogers v. Frito-Lay, Inc.*, 611 F.2d at 1080 ("[W]hat happened after a statute was enacted may be history and it may come from members of the Congress, but it is not part of the legislative history of the original enactment"), and Judge Goldberg's dissent in *Rogers*, 611 F.2d at 1100 ("it is a well-established principle that the post-enactment treatment of a statute by Congress is cogent evidence of the intent of Congress at the time of its passage"). We believe our view is called for by *Cannon v. University of Chicago*, 441 U.S. at 686–87 n. 7, 99 S.Ct. at 1952–53 n. 7, in which the Court, while partially relying on subsequent legislative history, noted that "we cannot accord these remarks the weight of contemporary legislative history. . . ." *See WATCH v. Harris*, 603 F.2d at 324–25; *North Haven Board of Education v. Hufstedler*, 629 F.2d 773, 783–85 (2d Cir. 1980), *cert. granted*, 450 U.S. 909, 101 S.Ct. 1345, 67 L.Ed.2d 332 (U.S.1981).

The subsequent legislative history of the Rehabilitation Act is internally conflicting. The 1974 amendments deal expressly with section 504, equating it with Title VI (42 U.S.C. § 2000d–1) (race discrimination) and Title IX (42 U.S.C. § 1683) (sex discrimination). Senate Report No. 93–1297, which urged overriding the President's veto of the 1974 amendments, expressly noted that section 504 permits a private right of action. *See* 1974 U.S.Code Cong. & Ad.News 6373, 6390.

In contrast, the Senate Conference Committee never explicitly stated that section 503 confers a private right of action. Although the report did state that "[i]t is intended that sections 503 and 504 be administered in such a manner that a consistent, uniform and effective Federal approach to discrimination against handicapped persons would result," *id.* at 6391, this appears to refer simply to the desirability of cooperation between the Department of Health, Education, and Welfare, which was assigned to enforce section 504, and the Department of Labor, which was assigned to enforce section 503. This separate as-

signment may even indicate that section 503, unlike 504, was not intended to be privately enforced; the Department of Labor, unlike the Department of Health, Education, and Welfare, lacked experience in dealing with private lawsuits. *See Rogers v. Frito-Lay, Inc.*, 611 F.2d at 1081 n. 7.

The only indication that a "uniform" approach to combatting employment discrimination against the handicapped might entail a private right of action under section 503 as well as section 504 is the remarks of a senator who was not a member of the conference committee, although he was one of the principal sponsors of the original Act and its subsequent amendments. Senator Robert Stafford of Vermont stated on the floor in 1974 that enforcement under both sections 503 and 504 should be similar to enforcement under Title VI and Title IX. 120 Cong.Rec. 30551 (1974). These remarks were not, however, included in the conference committee report. Furthermore, although an exchange of correspondence between the Senate Committee on Labor and Public Welfare and the Secretary of Labor regarding the enforcement of section 503 is appended to the report, nowhere in that correspondence is there any hint that the statute was to be enforced through private lawsuits. *See, e. g.*, 1974 U.S.Code Cong. & Ad.News 6425, 6429, 6430, 6438, 6439–40. The only portion of the exchange between Committee and Department dealing with complaints relates to the Department's taking "primary responsibility for enforcement of complaints" and the Senate Committee's concern that "there is too much emphasis given to the contracting agency's internal resolution of such complaints because there is no standard established in the [Labor Department's] regulations as to what is an effective or accepted internal review procedure." *Id.* at 6429.

With the exception of Senator Stafford's statement on the floor, then, the legislative intent demonstrated by the history of the 1974 amendments simply does not support implication of a private right of action under section 503. In 1978, however, when Congress again amended the Act by adding

section 505 to provide for attorney's fees "[i]n any action or proceeding to enforce or charge a violation of [the Act]," 29 U.S.C. § 794a, the accompanying Senate Report clearly assumed that a private judicial remedy was available under section 503: "[T]he availability of attorney's fees should assist in vindicating private rights of action in the case of section 502 and 503 cases, as well as those arising under section 501 and 504." S.Rep.No. 890, 95th Cong., 2d Sess. 19 (1978) (Human Resources Committee). H.R. Rep.No. 95–1149, 95th Cong., 2d Sess. 21 (1978) (Education and Labor Committee), *reprinted in* 1978 U.S.Code Cong. & Ad. News 7312, 7332, spoke in exactly the same terms.[8]

Neither the Senate nor the House Reports, however, contained any reference to the existing case law from the district courts. Although two district court cases had found that there was a private right of action under section 503, *Duran v. City of Tampa*, 430 F.Supp. 75 (M.D.Fla.1977); *Drennon v. Philadelphia General Hospital*, 428 F.Supp. 809 (E.D.Pa.1977), three cases had held that no implied right of action existed, *Wood v. Diamond State Telephone Co.*, 440 F.Supp. 1003 (D.Del.1977); *Moon v. Roadway Express, Inc.*, 439 F.Supp. 1308 (N.D.Ga.1977), *aff'd*, *Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074 (5th Cir. 1980); *Rogers v. Frito-Lay, Inc.*, 433 F.Supp. 200 (N.D. Tex.1977), *aff'd*, 611 F.2d 1074 (5th Cir. 1980).

This failure to note the conflicting case law of the time indicates that the reference to private rights of action being available in section 502 and 503 cases as well as those arising under sections 501 and 504 was inadvertent. This seems especially true in light of the Senate Report's extensive reference to the testimony of Deborah Kaplan of the Disability Rights Center before the Sub-committee on the Handicapped, S.Rep.No. 890, *supra*, at 18–20. Her testimony quoted in the Senate Report related only to sections 501 and 504:

> Unfortunately, the disabled citizens who are protected by section 501 as well as section 504 stand alone among minority groups in this country, since they remain largely unaffected by the recently enacted Civil Rights Attorney's Fees Awards Act of 1976, Public Law 94–559, and because the legislation which protects their civil rights contains no attorney's fees provision. Thus many disabled people, who desperately need to vindicate their rights through the courts, have been utterly frustrated and disillusioned because they could neither afford an attorney, locate one able to represent them without a fee, nor seek an attorney's fee award from the courts.

*Id.* at 19. We note also the Seventh Circuit's point in *Simpson v. Reynolds Metals Co.*, 629 F.2d 1226, 1242 (7th Cir. 1980), that allowing attorney's fees in actions or proceedings brought under section 503 may have been intended to provide for attorney's fees either in a section 503(b) proceeding before the Department of Labor or in a judicial proceeding brought pursuant to the Department of Labor's regulations permitting the director of the Office of Federal Contract Compliance Programs (OFCCP) to seek appropriate judicial action to enforce the affirmative action contractual provisions required under the Act. *See* 41 C.F.R. § 60–741.28(b) (1980).[9] In short, even giving appropriate weight to the subsequent legislative history reflected in the 1978 amendment, we find nothing that compels us to the conclusion that a private right of action exists under section 503. The assumption in the 1978 congressional reports

---

**8.** The House Report stated: "The new section permits courts, at their discretion, to award to the prevailing party, other than the United States, in any action to enforce sections 501, 503 or 504 of the act, a reasonable allowance to cover the costs of attorneys' fees."

**9.** Section 60–741.28(b) of the regulations reads as follows:

> *Judicial enforcement.* In addition to the administrative remedies set forth herein, the Director may, within the limitations of applicable law, seek appropriate judicial action to enforce the contractual provisions ... including appropriate injunctive relief.

simply "cannot be relied upon as a faithful indicator of prior congressional intent." *Simpson v. Reynolds Metals Co.*, 629 F.2d at 1243.

Given the somewhat ambiguous legislative history, however, we must proceed to the third question under *Cort v. Ash*: whether it is consistent with the underlying purposes of the legislative scheme to infer a private right of action for the handicapped person discriminated against by his employer. Here we note, as did the *Rogers* majority, 611 F.2d at 1084, that Congress provided a rather complete administrative scheme to remedy section 503 violations and that the implementing regulations, 41 C.F.R. §§ 60–741.4 to 60–741.54 (1980), emphasize resolving complaints to the Department of Labor "by informal means, including conciliation, and persuasion, whenever possible," *id.* § 60–741.28(a). The regulations provide as remedies withholding of progress payments, termination of existing contracts, or debarment from receiving future contracts, *id.* § 60–741.28(c) to (e), rather than remedies running to the discriminated-against employee. In this regard, the administrative procedures established by the Act and implementing regulations are remarkably consistent with those under the Comprehensive Employment and Training Act (CETA) discussed in *CETA Workers' Organizing Committee v. New York*, 617 F.2d 926 (2d Cir. 1980). Although the scheme for implementation of the CETA provided in CETA § 106, 29 U.S.C. § 816, may be somewhat more sophisticated than that provided for by section 503 of the Rehabilitation Act— the Rehabilitation Act regulations contain no deadlines for the processing of complaints, 41 C.F.R. § 60–741.26(e) (1980)—we cannot find this distinction between the cases very significant. Rather, as in *CETA Workers*, 617 F.2d at 933–34, we believe that the underlying congressional purpose was to provide an administrative procedure for the determination of complaints under which the administering agency was to use its powers to enforce the section in question. *See Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, —— U.S. ——, ——, 101 S.Ct. 2615, 2623,

69 L.Ed.2d 435 (1981); *Transamerica Mortgage Advisors*, 444 U.S. at 19, 100 S.Ct. at 247. And though the Rehabilitation Act failed directly to provide for judicial review of such an administrative procedure, the Department of Labor evidently thought that such review might be possible, as indicated by regulation section 60–741.28(b). The implementing regulations do incorporate the elaborate and sophisticated hearing practice and procedure used to enforce equal opportunity under Executive Order No. 11,246, *reprinted in* 41 C.F.R. part 60–30, *see* 41 C.F.R. § 60–741.29(b) (1980); these elaborate hearing provisions culminate, or may culminate, in a final administrative order, *id.* § 60–30.37, which is in our view reviewable like other administrative orders under the Administrative Procedure Act and particularly 5 U.S.C. §§ 701–706.

To be sure, the regulations' failure to specify time limits has presented a problem that is particularly evident in the case at bar. The Department of Labor has, contrary to the will of Congress, been unable to comply speedily with the provisions of the Rehabilitation Act. This has resulted in the Department's taking the position in the past, although it takes no position here, that a private cause of action should be permitted in order to remedy section 503 violations more effectively and indeed an acknowledgment that "[t]he net effect of [OFCCP] discretion is that there is no assurance that compliance decisions are not tempered by political, procurement, personal or other potentially competing or conflicting requirements," OFCCP Task Force, Preliminary Report on the Revitalization of the Federal Contract Compliance Program (1977), *quoted in Rogers v. Frito-Lay, Inc.*, 611 F.2d at 1106 (Goldberg, J., dissenting). The agency backlog and its position in favor of recognition of a private remedy are set forth in an affidavit by the director of the OFCCP, quoted in an appendix to the *Rogers* opinion, 611 F.2d at 1108–09, and submitted in an *amicus* brief to Judge Lasker in *Chaplin v. Consolidated Edison Co. of New York, Inc.*, 482 F.Supp. 1165, 1172 (S.D.N.Y.1980). While lack of executive resources to enforce

an act of Congress is regrettable, it is hardly the judiciary's role to redress that lack by inferring a judicial remedy. *See Piper v. Chris-Craft Industries*, 430 U.S. 1, 41, 97 S.Ct. 926, 949, 51 L.Ed.2d 124 (1977); *Riegel Textile Corp. v. Celanese Corp.*, 649 F.2d 894, 904–05 (2d Cir. 1981).

Moreover, although a department's position on whether an implied private cause of action exists is entitled to judicial consideration, *see Cannon*, 441 U.S. at 686–88, 99 S.Ct. at 1952–53, *cf. North Haven Board of Education*, 629 F.2d at 777 (a court should "give due weight to the contemporaneous construction of a statute by the agency charged with its administration"), an agency's expertise, "[e]ven if the agency spoke with a consistent voice, . . . is of limited value when the narrow legal issue is one peculiarly reserved for judicial resolution, namely whether a cause of action should be implied by judicial interpretation in favor of a particular class of litigants." *Piper v. Chris-Craft Industries*, 430 U.S. at 41 n. 27, 97 S.Ct. at 949. *See Riegel Textile Corp. v. Celanese Corp.*, 649 F.2d at 897 n. 4. As Judge Learned Hand stated:

> [I]t is doubtful whether in the end one can say more than that there comes a point at which the courts must form their own conclusions. Before doing so they will, of course—like the administrative tribunals themselves—look for light from every quarter, and after all crannies have been searched, will yield to the administrative interpretation in all doubtful cases; but they can never abdicate.

*Niagara Falls Power Co. v. FPC*, 137 F.2d 787, 792 (2d Cir.), *cert. denied*, 320 U.S. 792, 64 S.Ct. 206, 88 L.Ed. 477 (1943).

In any case, an after-the-fact acknowledgment of inadequacy because of limited departmental resources is not the equivalent of a long-held, firmly established, well-reasoned position that the agency has made known to Congress and to the courts over the years, such as in *Cannon*, 441 U.S. at 688 n. 8, 99 S.Ct. at 1952–53, or in *North Haven Board of Education*, 629 F.2d at 783–84. Indeed, the record here contains no such similar statement by the agency. *Cf.*

*Simpson v. Reynolds Metals Co.*, 629 F.2d at 1244 (discussing the OFCCP's representation of inadequacy in *Rogers* and *Chaplin* but noting the absence of any such representation in the record in that case).

We need not deal with the fourth *Cort v. Ash* factor; it is plain enough that discrimination against the disabled has not been a matter traditionally relegated to state law. But we conclude, as have the other three courts of appeals that have passed upon the question, that no implied private right of action exists under section 503, recognizing that the glass through which we see is by no means crystal clear but is so cloudy as to be barely translucent.

Judgment reversed.

IRVING R. KAUFMAN, Circuit Judge, (dissenting):

The majority holds that handicapped individuals have no private right of action under § 503 of the Rehabilitation Act of 1973, 29 U.S.C. § 793. It takes this rigid position in the face of appellant's charge that United Air Lines discriminated against him because of his handicap since it believes that the demands of the four-factor *Cort* test have not been met. I cannot agree. A careful analysis in keeping with the *Cort* approach does not compel this harsh result to Davis, a diagnosed epileptic placed on unpaid "extended illness status" and then terminated by his employer. Accordingly, I dissent.

The threshold question under *Cort* is whether the plaintiff was one of the class for whose "especial benefit" § 503 was enacted. *Cort v. Ash*, 422 U.S. 66, 78, 80–82, 95 S.Ct. at 2088, 2089, 45 L.Ed.2d 26 (1975). This inquiry focuses on whether Congress intended to benefit a clearly defined class rather than to protect the general public. *Cannon v. University of Chicago*, 441 U.S. 677, 690–92, 99 S.Ct. at 1954–55 (1979). Looking to the language of the statute may provide evidence of this intent. *Id.* Here, the language of § 503(a) and (b) specifically identifies the class, "handicapped individuals," and provides equal employment opportunities for all who fall within it. Indeed,

relying on this approach to the first *Cort* factor, virtually all of the district courts analyzing § 503, including those that ultimately found no private right of action, have concluded that the statute was enacted for the "especial benefit" of the handicapped. *See, e. g., California Paralyzed Veterans Assn. v. FCC,* 496 F.Supp. 125, 128–29 (C.D.Cal.1980); *Hart v. County of Alameda,* 485 F.Supp. 66, 68 (N.D.Cal.1979); *Anderson v. Erie Lackawanna Ry. Co.,* 468 F.Supp. 934, 936 (E.D.Ohio 1979).

The majority, however, contends that when § 503 is examined for "right- or duty-creating language," *Cannon v. University of Chicago, supra,* 441 U.S. at 690 n.13, 99 S.Ct. at 1954, no indication of an intention to establish a federal right in favor of the plaintiff can be found. *See Cort v. Ash, supra,* 422 U.S. at 78, 95 S.Ct. at 2088. While the absence of such a "talismanic incantation," *Rogers v. Frito-Lay, Inc.,* 611 F.2d 1074, 1092 (5th Cir.) (Goldberg, J. dissenting), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980), is less relevant than the substance of the obligations created, the affirmative action language of § 503 may appear to create, when scrutinized closely, a duty for federal agencies, it is argued, not for employers. *Rogers v. Frito-Lay, Inc., supra,* 611 F.2d at 1079.

Although the duty-creating phrases are not conclusive in either direction, an analysis of the second and more important *Cort* factor, contrary to the majority's position, offers exceedingly strong evidence for giving a right of action to the handicapped individual. In considering whether the legislative history of § 503 sheds light on the private right of action question, *see Cort v. Ash, supra,* 422 U.S. at 78, 95 S.Ct. at 2088, three statutes carry weight and are directly relevant to our determination: the 1973 Rehabilitation Act, the Rehabilitation Act Amendments of 1974, and the attorney's fees provisions of the Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978.

I do not quarrel with the assertion that the legislative history of the 1973 Act provides little assistance. Debate primarily focused on the establishment of federally-funded programs for the handicapped, not on the relatively non-controversial antidiscrimination provisions of §§ 503 and 504. Nor is an examination of the history surrounding the 1974 Amendments to the Act particularly enlightening, because discussion centered on redefining "handicapped individual," not on explicating the full meaning of §§ 503 and 504. The conference report, however, lends guidance. It states that § 504 permits a "judicial remedy through private action," S.Conf.Rep.No. 93–1270, 93rd Cong., 2d Sess. 25, 26 (1974), and notes, as the majority recognizes, that both sections will be administered to effect a uniform approach to discrimination against handicapped persons. *Id.* at 27. Such language, I believe, should fairly be read to suggest that, since Congress recognized a private right of action under § 504, such a remedy would not be inconsistent with Congress's purpose in § 503. *See Rogers v. Frito-Lay, Inc., supra,* 611 F.2d at 1096 (Goldberg, J. dissenting). In addition, during the Senate debate, Senator Robert Stafford, one of the principal sponsors of the original Act and its later amendments, stated that enforcement of both sections would be similar to that of § 601 of the Civil Rights Act and § 901 of the Education Amendments of 1972. 120 Cong.Rec. 30551 (1974). Although a private right of action was found to exist for the Education Amendments in *Cannon, supra,* the majority denigrates the value of Senator Stafford's remarks.

More conclusive evidence of a congressional intent to authorize a private action is found in the 1978 attorney's fees amendments. 29 U.S.C. § 794a(b). This provision explicitly presumes private judicial actions because attorney's fees are made available to parties "other than the United States" and because the language looks to actions before "courts," not administrative agencies. The Senate Report and Senate debates also indicate that private actions were envisioned. The majority concedes that the accompanying Senate Report explicitly stated that the availability of attorney's

fees was intended to aid handicapped individuals in "vindicating private rights of action in the case of section . . . 503 cases." S.Rep.No.890, 95th Cong., 2d Sess. 19 (1978). The majority further acknowledges that H.R.Rep.No.1149, 95th Cong., 2d Sess. 21 (1978), *reprinted in* U.S.Code Cong. & Ad. News 7312, 7332, took precisely the same position.

My brothers have decided that this legislative material is "unpersuasive" and virtually dismiss it. They adopt the rationale that failure to discuss the then-existing case law indicates that references to the availability of a § 503 private right of action were "inadvertent." I realize that "even Homer nods," but such a bald refusal to acknowledge a clear, express statement of congressional intent is inexcusable. Granted, the evidence surrounding the passage of the 1978 attorney's fees amendments carries less weight than contemporary legislative history, but this evidence is strongly relevant in determining what members of Congress assumed they had done several years previously. It is clear from the legislative history that Congress premised the attorney's fees provision on the existence of an implied remedy. Furthermore, interpreting an attorney's fees amendment to reveal Congress's intent is surely not a novel method of construction, as the majority's position would appear to suggest. In *Cannon*, interpretation of the legislative background of the attorney's fees amendment to § 901 of Title IX served as the basis for the Court's recognition of a private right of action. *See Cannon v. University of Chicago, supra,* 441 U.S. at 686 n.7, 99 S.Ct. at 1952. Indeed, Congress is generally considered to be a creditable interpreter of its actions, and judicial deference to these interpretations is appropriate. *See, e. g., Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1075, 60 L.Ed.2d 608 (1979); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Federal Housing Administration v. The Darlington, Inc.,* 358 U.S. 84, 77 S.Ct. 381, 1 L.Ed.2d 363 (1958).

Here, the notion that the view of a subsequent Congress forms a weak foundation for inferring the intent of an earlier one, *see Consumer Product Safety Comm'n. v. GTE Sylvania, Inc.,* 447 U.S. 102, 117, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980), is not a persuasive argument. Many members of the relevant committees in 1978 were also members of those committees in 1973. I doubt that these distinguished members of Congress who labored over trail-blazing legislation would have forgotten what they had intended a mere five years before the 1978 amendments. Contrary to the majority's poorly-supported and tenuous conclusion that the legislative history is ambiguous, the legislative history clearly indicates that Congress, in passing the attorney's fees amendments of 1978, assumed that a private right of action was created with the passage of § 503 in 1973. This assumption does not reflect a subsequent desire to amend the original enactment; rather, it illuminates the initial intent of the draftsmen.

The third factor of the *Cort* analysis considers whether a private right of action would support Congress's purpose in enacting the statutory scheme. *See Cort v. Ash, supra,* 422 U.S. at 78, 95 S.Ct. at 2088. Implication of a private right of action is not inconsistent with the underlying purpose of § 503—effective administrative enforcement. The Department of Labor and its office of Federal Contract Compliance Programs, it is interesting to note, have stated that the existence of an implied remedy would enhance informal conciliation and administrative enforcement in general. *See Chaplin v. Consol. Edison Co. of N. Y., Inc.,* 482 F.Supp. 1165, 1172 (S.D.N.Y.1980). Although the majority lightly dismisses these agency opinions, courts generally believe they are deserving of substantial weight. *See, e. g., Miller v. Youakim,* 440 U.S. 125, 99 S.Ct. 957, 59 L.Ed.2d 194 (1979); *Red Lion Broadcasting Co. v. FCC, supra.*

My brothers, in concluding that the mandates of the third *Cort* factor are not fulfilled, rely on an analysis contained in *CETA Workers' Org. Comm. v. City of New York,* 617 F.2d 926 (1980). Such reliance is

misplaced because *CETA* is readily distinguishable. The statutory presumption in favor of administrative enforcement is much more potent under the Comprehensive Employment and Training Act ("CETA") than it is under the Rehabilitation Act. Section 106 provides, in great detail, a sophisticated scheme for enforcement of CETA. In particular, the Secretary of Labor is required to reach a final determination on a complaint within 120 days. CETA § 106(b), 29 U.S.C. § 816(b). This complex enforcement mechanism suggests the "primacy" and "exclusivity" of the administrative grievance procedures. *CETA Workers' Org. Comm. v. New York, supra,* 617 F.2d at 931.

No such detailed machinery exists under the Rehabilitation Act, and even the accompanying Regulations contain no deadlines for the processing of complaints. 41 C.F.R. § 60–741.26(e) (1980) ("The Department of Labor shall institute a prompt investigation of each complaint . . ."). Surely, it does not require straining the legislative interpretation to envision a private right of action complementing the statutory enforcement mechanism for § 503. Indeed, the Department of Labor endorses this view. I submit that analysis of the third *Cort* factor differs for the two statutes. More importantly, it indicates that Congress would be more inclined to create a private right of action for a statute where provisions for administrative enforcement are not detailed and precise. But the majority, admitting that the CETA scheme is more fully developed, still finds the distinctions between the two of little significance even in light of the Department of Labor's statement that an implied right of action for § 503 violations should be permitted. The majority, it appears, attaches greater weight to tangential *exempla* than to direct, explicit evidence.

My brothers do not contend that the requirements of the fourth *Cort* factor—preemption of matters typically the concern of state courts—have not been met. As they acknowledge, invidious discrimination has always been addressed by federal legislation. *Cannon v. University of Chicago, supra,* 441 U.S. at 708–09, 99 S.Ct. at 1963–64

(citing *Steffel v. Thompson,* 415 U.S. 452, 464, 94 S.Ct. 1209, 1218, 39 L.Ed.2d 505 (1974).

In light of what I have said, I would hold that a private right of action under § 503 is clearly authorized. Handicapped persons are the "especial class" Congress meant to benefit from the enactment of § 503, and the 1978 attorney's fees amendments demonstrate that Congress assumed that the 1973 Congress intended to create this private right of action. Moreover, implication of a private right of action is not inconsistent with the goal of administrative enforcement of the statute's antidiscrimination provisions. We should be mindful that the handicapped must overcome not only physical and mental obstacles to full participation in society but also must surmount the barriers raised by discrimination caused by society's attitude toward them. Congress in § 503 sought to safeguard them from such discrimination and this protection includes providing for a private right of action.

I am aware that recent Supreme Court decisions counsel that private remedies are not to be inferred cavalierly, and, therefore, a cautious analysis is in order. The majority, however, has taken this advice to the extreme and has failed to acknowledge exceptions that have been carved out and clear indications of congressional purpose. I believe the only reasonable conclusion to be reached from applying the *Cort* analysis is that Congress intended handicapped individuals to have a private remedy under § 503. If the legislative history is not clear and precise, as the majority believes, Justice Holmes's counsel should not be ignored. He instructed us in 1908 that "[where Congress] has intimated its will, however indirectly, that will should be recognized and obeyed. . . . [I]t is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before." *Johnson v. United States,* 163 F. 30, 32 (1st Cir. 1908). The general scheme of the legislation, indeed, indicates that Congress, in affording new rights and privi-

leges to the handicapped, wished to redress the inequities borne by them. To hold otherwise is to take from an entire group of individuals who suffer odious discrimination an important right given them by Congress.